WATKINS PRODUCTS INCORPORATED, a foreign corporation, Plaintiff and Appellant,

v.

Clarence ANHORN and Delores Anhorn, Defendants and Respondents.

Civ. No. 8737.

Supreme Court of North Dakota.

Dec. 17, 1971.

Gerald W. Krengel, Towner, for plaintiff and appellant.

Ella Van Berkom, Minot, for defendants and respondents.

PAULSON, Judge.

This is an appeal by the plaintiff, Watkins Products, Incorporated [hereinafter Watkins] from the judgment of the district court of Ward County granting Watkins recovery in the amount of $3,232.48, plus interest. Watkins contends that it should have recovered the $8,927.94 alleged to be owed. The defendants, Clarence Anhorn and Delores Anhorn, have not appealed from the judgment entered against them.

This case deals with the interpretation of a surety agreement which was prepared

by Watkins and executed by Clarence and Delores Anhorn in order for the Anhorns to assist a friend to continue in the business of selling Watkins products.

Watkins is a foreign corporation doing business in North Dakota from its offices in Winona, Minnesota. Watkins' business is that of selling cosmetics, extracts, spices, health aids, household products, food products, feed fortifications, insecticides, and animal health products. These goods are sold through independent dealers who purchase products from Watkins and then retail the products on a door-to-door or farm-to-farm basis to their friends and neighbors. The usual method of transacting business is for Watkins to furnish the merchandise to its independent dealers on credit and then the dealers either pay for the merchandise when they sell it, if they are paid in cash, or they endorse to Watkins the notes which they receive from their customers. If the notes which a dealer endorses are not paid by his customers, the amount thereof is charged to the dealer's account with Watkins. Because of this arrangement, Watkins requires its dealers to secure the signatures of reputable, solvent citizens who agree to act as sureties for the dealer.

One of Watkins' dealers was Norman Cyril Olson who sold Watkins products in the Minot area. Olson first entered into business with Watkins on April 16, 1964. At that time Olson deposited $800 with a Winona, Minnesota, bank in lieu of sureties, which amount was to be used to secure the payment of any indebtedness which might arise on his account with Watkins. Some time prior to July 30, 1965, Olson owed to Watkins the amount of $4,032.48 and Watkins decided that it could not continue doing business with Olson unless the indebtedness was paid off or sureties could be found who would guarantee the payment of the indebtedness then owing. When the $800 deposit in the Winona bank was set off against the $4,032.48 owed, the balance remaining was $3,232.48, the amount which the district court awarded to Watkins.

In order to continue in business, Olson attempted to find individuals to act as sureties for him and it was at this time that he contacted the Anhorns. For the purpose of helping out a friend, the Anhorns by an agreement dated July 30, 1965, undertook to act as sureties for Olson. That agreement, a one-page printed form, furnished and prepared by Watkins, is set forth as follows:

"MS           $3232.48           1882
[typed in]        [typed in]        [typed in]

"THIS AGREEMENT, made at Winona, Minnesota, this ___30th___ day
                                                      [typed in]

of ___July___, 19__65__, between WATKINS PRODUCTS INC., a cor-
  [typed in]    [typed in]

poration, hereinafter called "Seller," and ___Norman Cyril Olson___ of
                                                [typed in]

Minot, North Dakota, 58701,     923–37th St. SE     hereinafter called
                          [typed in]

"Purchaser," witnesseth,

———◆———

"1. That in consideration of the promises and agreements of Purchaser hereinafter contained, to be kept and performed by him, Seller agrees, unless prevented by fire, strikes, or other cause, to sell and deliver to Purchaser, at its current wholesale

prices, F. O. B. Winona, Minnesota, or at its option, at any of its other regular places of shipment, such goods, other articles and supplies manufactured or sold by it, as Purchaser may reasonably require for the operation of his retail business, from the date hereof, until the first day of December, 19 67, LMF NAB in the locality in
[typed in] [initials in ink]
which he is now engaged, or intends to engage, in business, a description of which locality he agrees to furnish and deliver to Seller in writing prior to its acceptance of this agreement; but the furnishing of such description may be waived by Seller at its election, without notice to Purchaser or the sureties hereon.

"2. And in consideration thereof, Purchaser agrees to buy from Seller the goods, other articles and supplies reasonably required by him as aforesaid; and, in consideration of the extension of credit contemplated hereunder, agrees to furnish to it complete, regular, weekly, written records, showing separately the amounts of his cash sales, time sales, and collections; which records, however, or any of them, may be waived by Seller without notice to the sureties hereon, and he also agrees to furnish a complete financial statement when requested to do so.

"3. Purchaser further agrees to pay Seller its current wholesale prices for the goods, other articles and supplies sold to him, as herein provided, and also the prepaid transportation charges thereon, if any, by remitting to Seller each week at least sixty per cent (60%) of the amount received by him from his cash sales, and from his collections on sales previously made, at the time and in the manner and in accordance with the weekly records of Purchaser under the provisions of paragraph two hereof; and, at the expiration or termination of this agreement, to pay the whole amount therefor then remaining unpaid; or Purchaser may pay for such goods, other articles and supplies in cash, less the usual cash discount allowed for such payments; but such payments, or any

of them, may be waived or extended by Seller without notice to the sureties hereon, and without prejudice to the rights or interests of Seller.

"4. If Purchaser shall not pay cash for said goods, other articles and supplies so sold and delivered to him, and the payments at the time and in the manner hereinbefore provided are insufficient to pay therefor, or if Purchaser shall fail to pay on the indebtedness expressed herein, amounts satisfactory to Seller, from time to time during said term, Seller may, in its discretion, thereafter either limit the sales herein agreed to be made, or from time to time suspend the same, or require cash with each order, or cash upon delivery, until such indebtedness is, or such indebtednesses are, paid, or reduced, as Seller may require.

"5. Purchaser may, within thirty (30) days after the expiration or termination of this agreement, return, by prepaid freight, to Seller at Winona, Minnesota, or such other location as Seller may designate, any goods purchased by him from Seller, which he may then have on hand and are in salable condition; and Seller agrees to repurchase such goods if in salable condition when received by it, and pay or credit Purchaser therefor at the invoice price, or at Seller's then prevailing wholesale price, which ever shall be lower. If any such returned goods are not in salable condition when received by Seller, Seller may restore them to such condition if that can be reasonably done, and make a reasonable charge therefor and deduct such charge from the repurchase price of such goods, and pay or credit Purchaser with the balance. Purchaser shall not return or Seller pay or allow credit for goods, articles or supplies which Seller has discontinued manufacturing or selling, any advertising matter of any kind, or any goods, articles or supplies which have been used or which cannot reasonably be restored to salable condition. Seller's determination as to the salability of goods returned for repurchase under this paragraph, and the charge, if

any, for restoring any such returned goods to salable condition and the amount of the repurchase price to be paid Purchaser or credited to his account shall become final and binding on Purchaser upon Seller's mailing to Purchaser in the regular course of its business a credit memorandum addressed to Purchaser at his last known address showing the amount of such credit, unless Purchaser within thirty days of such mailing, specifically itemizes his objections in writing, by registered mail, to Seller at Winona, Minnesota, as to the amount of such credit.

"6. Purchaser shall have no power or authority to make any statement or representation, or to incur any debt, obligation, or liability of any kind whatsoever, in the name of, or for, or on account of Seller.

"7. Seller shall have no interest in the accounts due for goods sold by Purchaser; and no oral or written statements, printed, advertising or other matter of Seller, sent to, or distributed by Purchaser, shall be construed to direct or control the sale or other disposition of said goods, or to change or modify the terms of this agreement.

"8. Masculine terms of expression herein shall be taken to include the feminine where applicable.

"9. It is also mutually agreed that upon acceptance by Seller this is the complete, entire and only agreement between the parties, and that it shall not be varied, changed, or modified in any respect except in writing executed by Purchaser and by an officer of Seller; and that either of the parties hereto may terminate this agreement at any time, if desired, by giving the other party notice thereof in writing by mail.

"10. Purchaser promises to pay Seller at Winona, Minnesota, from time to time, after thirty days from the date of acceptance of this agreement, in amounts satisfactory to Seller, the indebtendess [*sic*] he now owes Seller, and agrees, at the expiration or termination of this agreement, to pay any balance thereof then remaining unpaid, payment of which indebtendess [*sic*] is hereby so extended.

"11. Purchaser and Seller, for the purpose of settling and determining the amount of the indebtedness now owing from Purchaser to Seller, hereby mutually agree that the said indebtedness is the sum of

Thirty-two hundred thirty-two and 48/100 LMF NAB‗‗‗‗‗‗‗‗Dollars,

[typed in]                                        [initials in ink]

which sum Purchaser agrees to pay, and Seller agrees to receive, and payment of which is extended as above provided.

"IN WITNESS WHEREOF, Purchaser has hereunto set his hand and seal and Seller has caused these presents to be executed in its corporate name by its proper officer, at Winona, Minnesota.

"Purchaser sign
here WITH INK‗‗‗‗‗‗‗‗Norman Cyril Olson‗‗‗‗‗‗(Seal)
FULL NAME—NOT INITIALS
[signature handwritten in ink]

———◆———

"In consideration of the execution of the foregoing agreement by The Purchaser, which we have read, or heard read, and fully understand and hereby agree and assent to, and its promise to sell, and the sale and delivery by it, to Purchaser, as vendee, of goods, other articles and supplies, and the extension of the time of payment of

the indebtedness owing by him to said Seller, as therein provided, we, the undersigned sureties, do hereby waive notice of default or nonpayment and waive action required, upon notice, by any statute, against Purchaser; and we jointly, severally and unconditionally promise, agree and guarantee to pay said indebtedness, the amount of which is now written in said agreement, or if not written therein, we hereby authorize the amount of said indebtedness to be written therein; and we jointly, severally and unconditionally promise to pay for said goods, other articles and supplies, and the prepaid transportation charges thereon, at the time and place, and in the manner in said agreement provided. And we further severally agree that, in case of the death of one or more of us, the undersigned sureties, before the expiration or termination of this agreement, his estate shall continue liable with the surviving surety or sureties for all shipments made to Purchaser prior to receipt by the Seller at Winona, Minnesota, of written notice by registered mail of such death. It is further agreed that the foregoing shall not be binding on any of the parties hereto until accepted by Seller at Winona, Minnesota.

"SURETIES SIGN HERE WITH INK

| "Name | Occupation | Street or R.F.D. | City | State |
|---|---|---|---|---|
| "Clarence Anhorn (Seal) | Farmer | Route 2 | Velva, N. Dak |  |
| "Delores Anhorn (Seal) | Wife | Route 2 | Velva, N. Dak |  |
|  |  | [Blanks filled in were handwritten in ink] |  |  |
| _____ (Seal) |  |  |  |  |
| _____ (Seal) |  |  |  |  |

[Signatures handwritten in ink]

"The foregoing purchase and surety agreements are hereby accepted by Watkins Products, Inc., and executed in its corporate name by its proper officer, at Winona, Minnesota, this ___5th___ day of ___October___, 19 ___65___.

   [typed in]           [typed in]        [typed in]

"WATKINS PRODUCTS, INC.

"By

"H. M. Meyers Vice-president
[signature handwritten in ink]

"N.D. REN–DEC.EXP.   NF2506H–864–2C–4045"

---

We are confronted with the question of interpreting the contract to determine whether Watkins is entitled to recover a greater sum than $3,232.48.

In order that individuals such as the Anhorns are alerted to the obligations which they assume when they sign as sureties, our Legislature enacted §§ 22–01–06.1 through 22–01–06.5 of the North Dakota Century Code, setting out therein a rigid procedure which companies such as Watkins must follow before the persons signing as sureties become legally obligated. Watkins complied with the foregoing statutory requirements.

The Anhorns concede that they are obligated to pay $3,232.48, but Watkins contends that the Anhorns are obligated to

pay the entire indebtedness of Olson at the time of his death on December 17, 1967, specifically $8,927.94.

The Anhorns argue that they were induced to sign as sureties for their friend, Olson, because he told them that their liability would be limited to $3,232.48, and that he would secure life insurance designating the Anhorns as beneficiaries to cover that amount. Olson did not obtain such insurance.

The trial judge found that the misrepresentations by Olson were the moving causes which induced the Anhorns to sign as sureties and, accordingly, held that the Anhorns' liability was limited to $3,232.48. Watkins has specified this holding as error.

A review of the applicable North Dakota law reveals that the decision of the trial court cannot be sustained on the grounds stated in the findings of fact. The law on the subject of whether a creditor is bound by misrepresentations made by a principal to a surety has been stated by this court in Hartford Accident and Indemnity Co. v. Anderson, 155 N.W.2d 728 (N.D.1968), and in J. R. Watkins Company v. Vangen, 116 N.W.2d 641 (N.D.1962).

■ In *Anderson, supra*, 155 N.W.2d at 729, in paragraph 4 of the syllabus, we stated:

"When a principal obligor has induced his surety or guarantor to sign an instrument by false or fraudulent representations, such misrepresentations may not be set up by the surety or guarantor as a defense to an action on the endorsement or guaranty unless the obligee or guarantee has notice of or has participated in the fraud."

And in *Vangen, supra*, 116 N.W.2d at 642, in paragraph 5 of the syllabus, we stated:

"As a general rule fraud practiced by a principal upon his surety to which the creditor or his agent is in no sense a party does not affect the liability of the surety to the creditor. The acts or declarations of an alleged agent cannot be used to establish his agency in the absence of evidence tending to show the principal's knowledge and assent to such acts or declarations although after there has been prima facie establishment of agency evidence of his acts or declarations may be introduced to bind the principal if within the actual or ostensible authority of the agent."

There is nothing in the record to show that Watkins participated in or had knowledge of Olson's misrepresentations to the Anhorns and therefore we are bound by the decisions in *Anderson* and *Vangen*.

■ The fact that the decision of the trial court in the case at bar cannot be sustained on the basis of the findings of fact does not preclude this court from sustaining the decision on other grounds. In Kack v. Kack, 142 N.W.2d 754, 762 (N.D. 1966), this court stated, citing Stone v. Los Angeles County Flood Control Dist., 81 Cal.App.2d 902, 185 P.2d 396, 399 (1947):

" 'The question that concerns the reviewing court is whether or not the final decision, judgment or order is correct and not whether the reasons expressed in the opinion are in harmony with the result reached or whether they sustain the decision.' "

Accordingly we must examine the record to determine whether the decision can be sustained on other grounds.

■ In examining the record the court will be guided by the general rule in North Dakota that a surety is a favorite of the law. Narveson v. Schmid, 77 N.D. 814, 46 N.W.2d 288 (1951); State ex rel. North Dakota Workmen's Compensation Fund v. Padgett, 54 N.D. 211, 209 N.W. 388 (1926). While this rule has been eroded with respect to compensated sureties [American Casualty Co. of Reading, Pa. v. Brezina Const. Co., 295 F.2d 603 (8th Cir. 1961)], it remains in effect with respect to gratuitous sureties. See also Associates

Financial Services Co. v. Eisenberg, 51 Wis.2d 85, 186 N.W.2d 272 (1971). On the subject of gratuitous sureties, 72 C.J.S. Principal and Surety § 101, page 581, states:

> "A gratuitous surety is a favorite of the law, and the contract must be strictly construed so as to impose on the surety only the burdens clearly within its terms and it cannot be extended by implication, presumption, or construction."

The court will also be guided by the following sections of the North Dakota Century Code:

> 22–03–04, N.D.C.C. "Interpreting terms of a contract of suretyship.—In interpreting the terms of a contract of suretyship, the same rules are to be observed as in the case of other contracts."

> 9–07–03, N.D.C.C. "Contract interpreted to give effect to mutual intention.—A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting so far as the same is ascertainable and lawful. For the purpose of ascertaining the intention of the parties to a contract, if otherwise doubtful, the rules given in this chapter are to be applied."

> 9–07–04, N.D.C.C. "Intention ascertained from writing alone if possible.—When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible, subject, however, to the other provisions of this chapter."

> 9–07–05, N.D.C.C. "Real intention to govern in cases of fraud, mistake, or accident.—When through fraud, mistake, or accident a written contract fails to express the real intention of the parties, such intention is to be regarded and the erroneous parts of the writing disregarded."

> 9–07–14, N.D.C.C. "Interpreted as promisor believed promisee understood it.—If the terms of a promise in any respect are ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed at the time of making it that the promisee understood it."

> 9–07–19, N.D.C.C. "Uncertainty interpreted against party causing it—Presumption as to cause.—In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party, except in a contract between a public officer or body, as such, and a private party, and in such case it is presumed that all uncertainty was caused by the private party."

On the subject of interpreting uncertainty against the party causing it, see Minette v. Associated Chinchilla Breeders, Inc., 173 N.W.2d 485 (N.D.1970); Scott v. National Travelers Life Insurance Co., 171 N.W.2d 749 (N.D.1969); and Stuart v. Secrest, 170 N.W.2d 878 (N.D.1969).

Upon examining the written agreement, we find that the entire contract, and especially the surety agreement, is ambiguous and misleading.

The first two lines and a portion of the third line of the printed surety agreement are so confusing that they merit being set forth again:

> "In consideration of the execution of the foregoing agreement by *The Purchaser,* which we have read, or heard read, and fully understand and hereby agree and assent to, and *its* promise to sell, and the sale and delivery by *it,* to *Purchaser,* as vendee, of goods, other articles and supplies . . ." [Emphasis added.]

This language indicates that the Purchaser (Olson) is contemplating selling goods to himself.

Immediately following the above-quoted language in the printed surety agreement there are approximately two and one-half lines of provisions regarding consideration and waivers. Then we find the following pertinent language:

".  .  .  and we jointly, severally and unconditionally promise, agree and guarantee to pay *said indebtedness,* the amount of which is now written in said agreement  .  .  ." [Emphasis added.]

Considering this language, together with the fact that the figure $3,232.48 is typed in the center of the top of the page of the agreement and is also typed in words and in figures at paragraph 11 of the agreement, would lead all but the most astute reader to conclude that the agreement contemplates the Anhorns' maximum liability to be $3,232.48.

A little further on in the surety agreement we find the only language that might possibly obligate the Anhorns for a sum greater than $3,232.48, namely:

".  .  .  and we jointly, severally and unconditionally promise to pay for said goods, other articles and supplies  .  ."

If it were clear that the "said goods" contemplated were additional goods—other than the goods previously furnished—and if there were no other ambiguities, this language could create a liability to the extent of the additional goods furnished. Such is not the situation in this case, however, for, from the language of the surety agreement, the only alternatives are that "said goods" refers to the goods previously furnished to Olson or else to the goods which Olson is furnishing to himself. Since the latter alternative results in an absurdity, the more reasonable interpretation is that the words "said goods" refer to the goods furnished to Olson prior to the execution of the contract by the Anhorns.

This interpretation is in harmony with the sections of the North Dakota Century Code previously quoted.

Having considered the relevant parts of the agreement separately and having viewed the surety agreement in its entirety under the rule that uncertainty and ambiguity will be resolved against the party causing the uncertainty and ambiguity, we conclude that the agreement furnished by Watkins and executed by the Anhorns as gratuitous sureties cannot obligate the Anhorns for an amount greater than that owed by Olson at the time the Anhorns became sureties. Any other result would violate the rules of interpretation established by the Legislature and the intentions of the parties as ascertained from these rules. The surety agreement on its face is ambiguous and the only fair and reasonable interpretation which can be given to it, as determined from the language and from the extrinsic circumstances, is that the Anhorns agreed to act as sureties to the extent of Olson's indebtedness incurred up to the time of the execution of the subject agreement.

For the reasons that the Anhorns were gratuitous sureties, that the surety agreement was ambiguous, that the ambiguity was caused by the language of the printed form provided by Watkins, that the Anhorns intended and understood that their liability would be limited to $3,232.48, and that the Anhorns' interpretation of the contract was a reasonable one because of the language used, we hold that the Anhorns' liability to Watkins is $3,232.48.

For the reasons stated, the judgment is affirmed.

STRUTZ, C. J., and ERICKSTAD, TEIGEN and KNUDSON, JJ., concur.