**Lloyd B. GROVE, Plaintiff and Appellee,**

v.

**CHARBONNEAU BUICK–PONTIAC, INC., Defendant and Appellant.**

**No. 9180.**

Supreme Court of North Dakota.

March 24, 1976.

Rehearing Denied April 22, 1976.

---

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for defendant and appellant; argued by Ward M. Kirby, Dickinson.

Anseth & Rustad, Williston, for plaintiff and appellee; argued by Gerald H. Rustad, Williston.

SAND, Judge.

This is an appeal from the decision of the Stark County District Court awarding to Lloyd B. Grove damages equivalent to the value of the automobile which was offered by Charbonneau Buick-Pontiac, Inc. as a prize in a golf contest.

The Dickinson Elks Club conducted its annual Labor Day Golf Tournament on September 1 and 2, 1974. Posters were placed at various locations in the area announcing the tournament and the prizes to be awarded to the flight winners and runners-up. Included in the posters was an offer by Charbonneau of a 1974 automobile "to the first entry who shoots a hole-in-one on Hole No. 8." This offer was also placed on a sign on the automobile at the tournament. Grove testified that he learned of the tournament from a poster placed at the Williston golf course. He then registered for the tournament and paid his entry fee.

The Dickinson golf course at which the tournament was played has only 9 holes, but there are 18 separately located and marked tee areas so that by going around the 9-hole course twice the course can be played as an 18-hole golf course. The first nine tees are marked with blue markers and tee numbers. The second nine tees are marked with red markers and tee numbers. Because of this layout of the course, the tee area marked "8" and the tee area marked "17" are both played to the eighth hole. The tee area marked "17" lies to one side of tee area "8" and is approximately 60 yards farther from the hole.

Grove scored his hole-in-one in hole No. 8 on the first day of the tournament while playing from the 17th tee in an 18-hole match. He had played from the 8th tee previously on the same match and had scored a 3 on the hole.

Grove claimed he had satisfied the requirements of the offer and was entitled to the prize. Charbonneau refused to award the prize, claiming that Grove had not scored his hole-in-one on the 8th hole, as required, but had scored it on the 17th hole.

The trial court found that Grove had performed all of the conditions set out in the offer by Charbonneau so that there was a completed contract which Charbonneau had unlawfully breached by failing to donate the car. The court awarded damages to Grove of $5,800.00, plus interest.

Charbonneau claims the evidence was insufficient to support the trial court's finding that Grove had properly accepted and performed in accordance with the offer made by Charbonneau so as to impose a contractual duty upon Charbonneau to deliver the automobile or in the alternative be liable for damages. He also claims the trial court applied the wrong rule of law and that the findings of fact are clearly erroneous.

The selected following definitions found in Section II of The Rules of Golf as approved by the United States Golf Association and the Royal and Ancient Golf Club of St. Andrews, Scotland, effective January 1, 1974, may be helpful:

*"Flagstick*

The 'flagstick' is a movable straight indicator provided by the Committee, with or without bunting or other material attached, centered in the hole to show its position. It shall be circular in cross-section."

*"Hole*

The 'hole' shall be 4¼ inches in diameter and at least 4 inches deep. If a lining be used, it shall be sunk at least 1 inch below the putting green surface unless the nature of the soil makes it impractical to do so; its outer diameter shall not exceed 4¼ inches."

*"Putting Green*

The 'putting green' is all ground of the hole being played which is specially prepared for putting or otherwise defined as such by the Committee.

A ball is deemed to be on the putting green when any part of it touches the putting green."

*"Teeing Ground*

The 'teeing ground' is the starting place for the hole to be played. It is a rectangular area two club-lengths in depth, the front and the sides of which are defined by the outside limits of two markers. A ball is outside the teeing ground when all of it lies outside the stipulated area."

Similar and other definitions may also be found under the title *Golf*, page 559, of Volume 10 of the Encyclopaedia Britannica, copyrighted in 1973.

The offer made by Charbonneau Buick stated that a 1974 Pontiac Catalina would be awarded to the "first entry who shoots a hole-in-one on Hole No. 8." Grove claims that his performance was an acceptance of this offer and created a binding contract.

■ Rewards and prizes are governed by the general rules of contract. There must be a genuine offer and an acceptance. To collect a prize, the person must perform all of the requirements of the offer in accordance with the published terms in order to create a valid and binding contract under which he may be entitled to the promised award. *Holt v. Rural Weekly Co.,* 173 Minn. 391, 217 N.W. 345 (1928).

". . . the offerer has a right to prescribe in his offer any conditions as to time, place, quantity, mode of acceptance, or other matters which it may please him to insert in and make a part thereof, and the acceptance, to conclude the agreement, must in every respect meet and correspond with the offer, neither falling short of, nor going beyond, the terms proposed, but exactly meeting them at all points and closing with them just as they stand, and, in the absence of such an acceptance, subsequent words or acts of the parties cannot create a contract." 17 C.J.S. Contracts § 42, page 674.

See also § 9–01–16, NDCC.

■ The acceptance or performance may not be a modification of the offer. *Greenberg v. Stewart,* 236 N.W.2d 862 (N.D. 1975); *Swanson v. Linder,* 75 N.D. 751, 33 N.W.2d 62 (N.D.1948).

Substantial compliance, however, is sufficient. *Scott v. People's Monthly Co.,* 209 Iowa 503, 228 N.W. 263 (1929).

■ The general rule of the law of contracts which provides that where an offer or promise for an act is made, the only acceptance of the offer that is necessary is the performance of the act, applies to prize-winning contests. 87 A.L.R.2d 661, Prize Contests—Rights and Remedies.

"The promoter of such a contest, by making public the conditions and rules of the contest, makes an offer, and if before the offer is withdrawn another person acts upon it, the promoter is bound to perform his promise." 87 A.L.R.2d 661, *supra.*

In *Scott, supra,* the court in substance stated that where the promoter made the offer of money prizes and fixed the rules, the contestant had to substantially comply with the terms and conditions fixed in the promoter's offer to constitute an acceptance, and unless contestant did so there was no meeting of the minds and no contract. The court said that the burden is upon the contestant is such a case to establish, by a preponderance of the evidence, that the

promoter's offer was accepted by substantial performance under and in accordance with the terms and conditions of the offer, i. e., the rules of the contest.

The offer under consideration was as follows:

"As an added addition to this year's Labor Day Tournament, Charbonneau Buick-Pontiac will donate a 1974 Pontiac Catalina 4-door sedan with factory air to the first entry who shoots a hole-in-one on Hole No. 8."

There were also some other prizes offered by the sponsor of the tournament. The entry fee was $20.00. From the advertisements and publications of the tournament there appears to be no question that the game was to consist of 18 holes, rather than 9 or some other number.

The problem arises from the fact that the golf course used for the tournament was a 9-hole course upon which 18 holes were played by going around the course twice. If the course would have been an 18-hole course we do not believe a question would have arisen because each hole would have had its own designation from 1 through 18, but because a 9-hole course was converted to an 18-hole course each hole had an actual number and a hypothetical number.

Under this setting we are required to construe and interpret the language of the offer.

The North Dakota Legislature has enacted statutes designed to help in the interpretation of contracts and obligations.

Section 9–07–09, NDCC, states:

"The words of a contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."

The record before us does not disclose that any of the phrases or words used in the offer have a special meaning because of usage. If there is a special meaning to be ascribed to a phrase or word, it has not been brought to our attention.

If the language in the offer has a special meaning to the ordinary golfer, the record does not disclose this. The record before us contains no evidence in this respect.

The Rules of Golf, to which reference has been made earlier herein, do not address themselves to situations where a 9-hole course is converted to an 18-hole course and thus are of little or no help in the interpretation and construction of the language used in the offer.

Section 9–07–10, NDCC, states:

"Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense."

None of the words used in the offer stand out as being technical words. The argument was made by Charbonneau that the offer provided for a hole-in-one *on* hole No. 8, not in hole No. 8. However, this in itself is not controlling.

■ This court stated in *Overboe v. Overboe*, 160 N.W.2d 650 (N.D.1968), that when a word is used in an agreement between two parties, and the courts are called upon to interpret the agreement, such word is to be given its ordinary, popular meaning. The words are given the common prevailing meaning as generally understood among people.

Grove contends that the words of the offer, when used in their ordinary sense, mean that any time in the process of an official play in the tournament a ball is hit into the eighth hole in one stroke, from either tee No. 8 or tee No. 17, the conditions of the offer are satisfied. Charbonneau, however, contends that the language of the offer has a technical meaning under the rules of golf and that there cannot be a hole-in-one on hole No. 8 unless the ball, with a single stroke, is hit from tee area No. 8 and lands in hole No. 8.

Charbonneau also contends that the offer implies that The Rules of Golf, *supra*, apply and that an announcement was made to that effect to the players (golfers) before play began.

We have examined the rules, but have not found any, nor has any rule been called to our attention, which applies or covers the dispute under consideration. Rule 1 under Section III was called to our attention. It provides:

"The Game of Golf consists in playing a ball from the teeing ground into the hole by successive strokes in accordance with the Rules."

Unfortunately, it is not of any significant assistance.

Rule 30, under Section II, defines a "stipulated round" as consisting "of playing the holes of the course in their correct sequence unless authorized by the Committee. The number of holes in a stipulated round is 18 unless a smaller number is authorized by the Committee. . . ." However, this rule does not cover or apply to the dispute.

Charbonneau further contends that the claim for the prize was not submitted to the committee for consideration. Again, the rules do not cover the situation under dispute. The committee, according to Rule 11 of Section III, decides those items set forth in the Rule which do not include awards or prizes. For that matter, the offer made no reference to any committee which would act in determining whether or not the conditions of the offer had been met. It should be noted the sponsors of the tournament in this case were not the ones that made the offer. The offer was made by Charbonneau who could have placed some conditions or qualifications in the offer as to who should resolve the dispute, etc., in the event one arose, but this was not done.

The principal or sole dispute, in reality, between Grove and Charbonneau relates to the interpretation or construction of the words and phrases used in the offer. There is no significant dispute as to what happened on the golf course.

■ If the language of a contract leaves an uncertainty as to its meaning, the Legislature has provided for another test to be applied by the court in Section 9–07–19, NDCC, which states:

"In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party, except in a contract between a public officer or body, as such, and a private party, and in such case it is presumed that all uncertainty was caused by the private party."

■ The determination of the existence of an ambiguity in a contract is a question of law. *Johnson v. Auran*, 214 N.W.2d 641 (N.D.1974); *Stetson v. Investors Oil Inc.*, 140 N.W.2d 349 (N.D.1966).

■ Where a contract contains ambiguous terms which are in dispute it is the duty of the court to construe them. *Stuart v. Secrest*, 170 N.W.2d 878 (N.D.1969); *Stetson v. Investors Oil Inc., supra.* The ambiguous terms of a contract will be interpreted most strongly against the party who caused the ambiguity. *Cargill, Inc. v. Kavanaugh*, 228 N.W.2d 133 (N.D.1975); *Watkins Products Incorporated v. Anhorn*, 193 N.W.2d 228 (N.D.1971); *Stuart v. Secrest, supra.*

In *Schreiner v. Weil Furniture Co.*, 68 So.2d 149 (La.App.1953), the court stated it is a well settled proposition of law that where there is a dispute over what the terms of a contract are or what the stipulations mean the document must be interpreted against the one who has prepared it, and applied such rule to an offer of a prize made to the public. The *Schreiner* case involved a "count-the-dots" contest where certificates worth money-off on the purchase of a television were awarded. The plaintiff won and a dispute developed as to what prizes were to be awarded under the rules of the contest. The court held that it was the duty of the defendant to explain the contest so that the public would not be misled.

■ we believe the rule on ambiguous contracts applies to this case, and therefore any language of this contract which is not clear and definite or in which an uncertainty exists as to its meaning must be interpreted most strongly against Charbonneau.

Our research disclosed only one case in which the court dealt with a hole-in-one question, but in a different setting. The Supreme Court of Nevada, in *Las Vegas Hacienda v. Gibson*, 77 Nev. 25, 359 P.2d 85 (1961),[1] had under consideration the question whether or not the offer and promise to pay an award to a person who, having paid fifty cents for an opportunity to make a hole-in-one, actually did make a hole-in-one, constituted wagering on the contention that a hole-in-one was a game of chance rather than a game of skill and that on such basis the offer or promise was invalid.

The court concluded that the contract or offer was valid and enforceable, and then stated as follows:

"Whereas we have concluded that the contract does not involve a gaming transaction, consideration of appellant's second assignment of error that the lower court erred in finding that the shooting of a 'hole in one' was a feat of skill, becomes unnecessary. We do wish to state, however, that the record contains sufficient evidence to sustain the court's finding in this regard. Appellant insists, however, that the testimony of one Capps, a golf professional, precludes such a finding. He testified that luck is a factor in all holes in one where skill is not always a factor. He further testified that 'a skilled player will get it (the ball) in the area where luck will take over more often than an unskilled player.'"

The crucial or pivotal point in this case rests upon the meaning of the language "a hole-in-one on Hole No. 8," where the 9-hole golf course was converted to or used as an 18-hole course without adding any additional holes. Does this language, "on Hole No. 8," refer to the actual, physical designation of the hole, which is generally identified with the number on the flagstick, or does it refer to the hypothetical number given to the hole because of the sequence in which it is "played"? If it is the latter, the 8th hole could also become the 17th hole in the second round of an 18-hole game of golf where the course is played around twice to make an 18-hole course out of a 9-hole course. The term could also mean the 8th hole in sequence of play regardless of the actual physical identification of the hole; as an example, if a player were to start his game with or on hole No. 2 (actually so marked) the 8th hole in sequence would be the 9th hole (actually so marked). The 8th hole under this concept would change depending upon the actual numerical designation of the hole from which the player started.

Charbonneau claims that the hole-in-one was actually accomplished on hole No. 17 because the course was a 9-hole golf course which was converted into an 18-hole course by going around the course twice.

However, Charbonneau's own testimony in this respect is not in support of his contention but rather tends to suggest a basis for the ambiguity.

"Q. [Anseth] In reality there is no such thing as hole number 17 at the Dickinson Golf Course.

"A. [Charbonneau] There is. Oh, I am sorry, no.

. . . . .

"Q. [Anseth] Is there, in reality, a hole on green—what is called a green number 8 that says hole number 17 on it?

"A. [Charbonneau] No; there isn't.

"Q. What would the marker of the hole say on green 8?

"A. On green 8?

"Q. Yes.

"A. It would remain as the flag would say, yes.

"Q. Hole number 8?

"A. There is only one flag, and that's 8.

"Q. It would be 8 on the flag?

"A. Right."

In this instance, Grove and his group of players started with (from) tee No. 4 or

---

1. This case is not pertinent to the conclusion but is of significant interest, even though the lottery question was not raised by either party but merely touched upon by the court during oral argument.

hole No. 4. "On Hole No. 8" would then correspond to either hole No. 11 or No. 2, depending upon the particular sequence in which the holes were played, if the term "on Hole No. 8" refers to and means the hole played in sequence, as distinguished from the actual numerical designation of the hole.

Grove, on the other hand, argues that "hole-in-one on Hole No. 8" simply means a hole-in-one on the actual numerical designated hole No. 8 from any legitimate tee, in this instance from either No. 8 or No. 17, each having hole No. 8 as the final destination for the ball.

The following testimony explains the sequence in which the holes, both actual and hypothetical, were played.

"Q. [Kirby] And then you played holes 4, 5 through 9 on the first go around and you don't remember the color of the tees, but you were playing the first nine?

"A. [Grove] Yes.

"Q. And then when you had completed the play on hole number 9, you went to hole number 1, did you not?

"A. Yes.

.    .    .    .    .

"Q. And then you went to green—you were playing green number 4, but you went to a different tee this time; did you not?

"A. Yes.

"Q. And that tee was marked as hole number 13, was it not?

"A. I assume it would be, yes.

.    .    .    .    .

"Q. And you played through 14, 15, 16 and you finally got to the tee marked number 17, which is a two hundred and eighteen yard hole?

"A. Yes.

"Q. And there is where you swung your club once from the teeing area and your ball went in on the first stroke; isn't that correct?

"A. Yes."

The sequence in which the holes were played also suggests room for misunderstanding. Why were the holes not played in the following sequence: 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 1, 2, 3; instead of: 4, 5, 6, 7, 8, 9, 1, 2, 3, 13, 14, 15, 16, 17, 18, 10, 11, 12? This tends to illustrate, however, why misunderstandings arise in converting a 9-hole course into an 18-hole course. The rules of golf to which reference has been made do not provide the manner or sequence in which the holes should be played where a 9-hole course is converted or used for an 18-hole course.

The record contained little or no evidence which would have a bearing on the interpretation and construction of the language in the offer.

In an effort to learn more about the term "on hole No. _____" or if it has a meaning peculiar to golfers, we resorted to an article by John P. May, entitled "Hole-in-One Roundup" found in *Golf Digest* for March 1976. We found the following expressions for a hole-in-one:

"holed out a tee shot on  .  .  .  165-yard third hole."

"Knocked one in on the 103-yard 13th hole."

"aced the 135-yard 13th hole."

"tee shot on the 190-yard 12th hole  .  .  bounced into the hole."

"dunked his tee shot on the 110-yard fifth hole."

"tee shot  .  .  .  found the cup on the 80-yard first hole."

"Scored a hole-in-one on the 135-yard fourth hole."

"She dropped in her tee shot on the 119-yard ninth hole."

"put his tee shot into the hole."

"zonked the 9th."

In the same article the following interesting description of consecutive holes-in-one (apparently on a 9-hole course converted and used as an 18-hole course) was found:

"  .  .  .  finished an 18-hole round on the nine-hole  .  .  .  Golf Club course in Frampton, Quebec, Aug. 24 by holding tee shots on the 220-yard eighth and the

155-yard ninth (the 17th and 18th holes of the day for him)."

We presume this article used golfer's language, but whether it did or not is not significant. However, we note specifically that in describing where the consecutive holes-in-one occurred the actual numerical designation for each hole instead of the hypothetical number was used, such as "on the eighth and the ninth" with the hypothetical numbers, 17th and 18th, in parenthesis. While our conclusion does not rest upon this article, we are satisfied that it clearly demonstrates the need for greater clarity and specificity where a 9-hole course is converted or used for an 18-hole course, instead of a regular course with 18 holes.

The offer does not contain any qualifications, restrictions, or limitations as to what is meant by the phrase "on hole No. 8." Neither does the award or offer make any statement restricting or qualifying that the hole-in-one on hole No. 8 may be accomplished only from tee No. 8. If Charbonneau had in mind to impose limitations, restrictions, or qualifications he could have made this in the offer so that a person with ordinary intelligence would have been fully apprised of the offer in every respect.

The distance from tee No. 17 to hole No. 8 was greater than the distance from tee No. 8 to hole No. 8. Thus an argument cannot be made that a player had an advantage playing from tee No. 17 to hole No. 8, as compared to playing from tee No. 8 to hole No. 8. Actually, it would be a disadvantage.

The record does not disclose that either Grove or any other party made inquiries of Charbonneau or that Charbonneau made any explanation as to what was intended by the offer, particularly on the phrase "on hole No. 8," prior to the event here in question. We are thus limited to the actual words themselves.

The offer was not limited to professionals but was open to golfers generally who paid the fee and entered the tournament. Section 9–17–10, NDCC, has little application because technical words were not used. The offer must be construed by giving the meaning commonly ascribed to the words used.

Exhibit 1 states, "Championship and all flights will play 18 holes on Sunday." The flights on Monday, except for the championship flights, apparently did not play 18 holes. This does not help to avoid confusion.

Charbonneau argues that if "on Hole No. 8" were construed to mean the hole having an actual No. 8 as distinguished from a hypothetical number, the flight of players doing an 18-hole course would have a double chance. This argument falls short of a legal basis for construing the offer and is, therefore, rejected.

It has become quite obvious that the answer or solution to the overriding question which initially may have seemed relatively simple and easy, even suspiciously so, is now actually, upon closer examination and after further analysis, considerably more challenging, demanding, and difficult.

This court in *In re Estate of Johnson*, 214 N.W.2d 112 (N.D.1973), in substance said that when good arguments can be made for either of two contrary positions as to the meaning of a term in a document an ambiguity exists. It also stated that the question whether or not an ambiguity exists is a question of law for the court. The contending parties have made good arguments, if not convincing arguments, for their positions.

Taking into account all of the foregoing considerations, we are satisfied that the language in question, "hole-in-one on Hole No. 8," in the offer, under this setting [2] is ambiguous.

2. "In this setting" as used in this opinion means a situation where a 9-hole golf course was converted into and used as an 18-hole course by merely giving the existing nine holes hypothetical numerical designation in addition to the actual designation rather than by physically adding more holes, and by adding an additional set of tees to correspond to the hypothetical numerical designations.

Having concluded as a matter of law that the offer in this setting is ambiguous, the rule of law providing that the ambiguous terms will be construed and interpreted most strongly against the party who caused the ambiguity applies. Section 9–07–19, NDCC; *Cargill, Inc.; Watkins Products Incorporated; Stuart;* and *Schreiner, supra.*

The record does not provide any evidence whether or not anyone directed or exercised any influence over Charbonneau as to the language employed in the offer. However, such evidence would not be of much assistance unless it were in such form and nature so that the general public would have benefited from it in forming the meaning of the offer. We assume that Charbonneau is responsible for the language employed.

We have no reason to suspect that anyone other than Charbonneau deliberately chose the ambiguous language. We are not suggesting that Charbonneau intended to trifle with the public, but if we do not apply the rule of law on ambiguous contracts, as set out earlier herein, to this situation we would permit promoters to trifle with the public, which we do not believe the law should permit, and in fact, does not permit.

If this rule of law were not applied it would permit the promoter who is so inclined, where there has been a performance, to keep adding requirements or conditions which were not stated in the offer. As an example, such as, "must use a certain club; the ball must be of a certain brand; the play must be accomplished by a person playing left-handed," to name only a few.

Both of the constructions and interpretations of the language in the offer as contended by the parties are reasonable and each has some strong convincing points, but that does not constitute legal grounds for not applying the rule of law as to how ambiguities in a contract are to be resolved in a situation or setting we have here.

The fact that another golfer, amateur or professional, may not have made a claim for the award under the same circumstances would not have any bearing on this question.

 By interpreting and construing the ambiguous provisions of the offer most strongly against the party who caused them as set out in § 9–07–19, NDCC, and as announced in case law developed on this subject, we construe it to mean that an entrant in the golf tournament who had paid the fee and who during regular tournament play drives the ball in one stroke into hole No. 8 from either the 8th or 17th tee has made a hole-in-one on hole No. 8, and has met the conditions of the offer and is entitled to the award or the equivalent in money damages.

The judgment of the district court is affirmed.

ERICKSTAD, C. J., and VOGEL, PEDERSON and PAULSON, JJ., concur.