# GILBERT ROSENTHAL *v.* AL PACKER FORD, INC.

[No. 612, September Term, 1976.]

*Decided June 8, 1977.*

The cause was argued before THOMPSON, MOYLAN and POWERS, JJ.

*Patrick A. O'Doherty* for appellant.

*Jeffrey I. Goldman,* with whom was *Joseph W. Spector* on the brief, for appellee.

POWERS, J., delivered the opinion of the Court.

A lawful and enforceable contract may come into being when one announces or circulates to all who may see or hear, an offer or promise that he will give or pay a reward or prize

to a person who performs a specified act, and the offer is accepted by performance of the act.

Such a contract was asserted by Gilbert Rosenthal, appellant here, in a suit for $20,000 he filed in the Superior Court of Baltimore City against Al Packer Ford, Inc., appellee here. Rosenthal lost below, when Judge Milton B. Allen granted summary judgment against him. His appeal from that judgment suffers a like fate in this Court.

In June 1972 Packer published newspaper advertisements conveying to the public, substantially this information:

> $20,000.00 Has Been Deposited In The Union Trust Bank & It Will Be Paid To Anyone Who Can Prove That This Offer Is Not Absolutely True!
>
> ———
>
> Six Days Only — Sale Ends Wednesday June 14th
> Brand New 1972 Fords! $89 Over Factory Invoice
> Full Price Inc. Freight & Dealer Prep.
> 411 Cars To Choose From
> Cars Must Be Sold From Stock June 8 To 14th

Rosenthal responded to the advertisement, and on 13 June 1972 he signed a contract with Packer for the purchase of a 1972 Ford automobile known as an LTD Brougham. This contract was never consummated, but that fact has little, if any, relevance to this case. Appellant's declaration does not claim a breach of his purchase contract. His claim is that Packer became obligated to pay him $20,000 when he proved that Packer's published offer was "not absolutely true". It is a mere coincidence that Rosenthal was himself a party to the transaction which he alleged did not conform to the offer.

Before we consider in further detail the facts before the lower court in this case, and the manner in which those facts were presented for the court's consideration on motion for summary judgment, we shall examine the texts and the cases, for a clearer understanding of the law.

A concise statement of the applicable principles is found in 67 Am. Jur. 2d *Rewards* § 13 (1973 & Supp. 1976):

> "As has been pointed out, an offer of a reward is merely a proposal, and acceptance of the terms of the offer is necessary to create a binding contract. Since an offer of a reward calls for an act, the performance of the act in compliance with the terms and conditions of the offer before its termination constitutes such an acceptance."

And it is said in 77 C.J.S. *Rewards* § 2 (1952 & Supp. 1976):

> "2. * * * rewards are essentially contractual. Accordingly, when an offer of reward is accepted by performance, it becomes a binding contract, based on the principles, and governed by the laws, of contracts generally; and this is especially true in the case of rewards offered by private individuals and organizations."

Also helpful is the comment found in Anno., *Prize Contests — Rights and Remedies*, 87 A.L.R.2d 649 (1963), where it is said, at 661:

> "The general rule of the law of contracts that where an offer or promise for an act is made, the only acceptance of the offer that is necessary is the performance of the act, applies to prize-winning contests. The promoter of such a contest, by making public the conditions and rules of the contest, makes an offer, and if before the offer is withdrawn another person acts upon it, the promoter is bound to perform his promise."

For a further discussion see 1A. Corbin, *Contracts*, § 64 (1963 & Supp. 1971).

Many of the cases we have reviewed are concerned with rewards for information leading to apprehension and

conviction of a criminal,[1] or with contests, in the traditional sense, involving competition among those undertaking to accept, with the prize usually going to the one who performs first or best. In some of the cases, the nature of the offer is such that it could be accepted by performance by one or more individuals, acting independently of each other. All of the cases apply contract law to hold that a binding contract comes into being[2] when a general offer to the public or a segment of the public is accepted, and also hold that performance of the specified act constitutes acceptance.[3]

Several of the cases we have reviewed merit further discussion. Two are non-competitive "prize" cases. The other three fall into precisely the same category as the case now before us. Each had its origin in a statement or claim published for the obvious purpose of advertising or promoting the goods or business of the offeror. In each case the claim was accompanied by the promise of a "reward" to anyone who could prove the claim to be wrong.

In each of the two "prize" cases, the prize was offered for a hole-in-one at golf. In *Las Vegas Hacienda, Inc. v. Gibson*, 359 P. 2d 85 (Nev. 1961), the owner of a golf course publicly offered $5,000 to any person, having entered for a 50 cent fee, who shot a hole-in-one on the course. Gibson entered, complied with all the conditions of the offer, and shot a hole-in-one. The offeror reneged, claiming that the alleged contract was a wager, and unenforceable, and that shooting a hole-in-one was not a feat of skill, but a feat of chance. The lower court held against Las Vegas Hacienda on both points.

---

1. The Court of Appeals of Maryland, in Gallagher v. Garrett, 144 Md. 241, 124 A. 898 (1923), had only to allocate a reward among various claimants, each of whom had contributed in varying degrees to the accomplishment of the single result, conviction of the persons who had committed a murder, for which the reward was offered. Far from denying their obligation to pay the reward, the offerors had paid the money into court with a bill of interpleader.

2. Madsen v. Dakota State Bank, 114 N.W.2d 93 (S.D. 1962); Schreiner v. Weil Furniture Co., 68 So. 2d 149 (La. App. 1953); Shorey v. Daniel, 234 P. 551 (Ariz. 1925); 87 A.L.R. 2d *supra* at 666; 67 Am. Jur. 2d *supra* at § 12.

3. Denny v. Reppert, 432 S.W.2d 647 (Ky. 1968); Madsen v. Dakota State Bank, *supra*; Sumerel v. Pinder, 83 So. 2d 692 (Fla. 1955); 87 A.L.R. 2d *supra* at 661; 67 Am. Jur. 2d *supra* at § 19 et seq.

The Supreme Court of Nevada affirmed. The court said, at 86:

> "The offer by one party of specified compensation for the performance of a certain act as a proposition to all persons who may accept and comply with its conditions constitutes a promise by the offeror. The performance of that act is the consideration for such promise. The result is an enforceable contract."

A defense raised with better grace, at least, was equally unsuccessful in *Grove v. Charbonneau Buick-Pontiac, Inc.*, 240 N.W.2d 853 (N.D. 1976). For the 1974 Labor Day Golf Tournament of the Dickinson Elks Club, Charbonneau had offered a 1974 Pontiac "to the first entry who shoots a hole-in-one on Hole No. 8." The golf course consisted of nine holes, and the tournament rules required the players to go around twice. There were but nine greens, and the nine holes were numbered 1 to 9. At the start of each hole, there were two tees, numbered 1 and 10, 2 and 11, etc. On the second time around, shooting from Tee No. 17, Lloyd B. Grove put his first and only shot into Hole No. 8.

Grove claimed the prize — Charbonneau declined to give it, saying that the hole-in-one was made on Hole No. 17. Grove sued and won. Charbonneau appealed. The Supreme Court of North Dakota affirmed. It held that the ambiguity in the terms of the offer was to be construed against the offeror. It said, at 856:

> "Rewards and prizes are governed by the general rules of contract. There must be a genuine offer and an acceptance. To collect a prize, the person must perform all of the requirements of the offer in accordance with the published terms in order to create a valid and binding contract under which he may be entitled to the promised award."
>
> * * *
>
> "The acceptance or performance may not be a modification of the offer."
>
> * * *

"Substantial compliance, however, is sufficient."

\* \* \*

"The general rule of the law of contracts which provides that where an offer or promise for an act is made, the only acceptance of the offer that is necessary is the performance of the act, applies to prize-winning contests."

The earliest of the decisions which fall into what might be called the "I'll pay you if you prove me wrong" category is the English case of *Carlill v. The Carbolic Smoke Ball Company*, [1892] 2 Q.B. 484. The facts, which were not in dispute, are set out in the report, at 484-85:

"The defendants, who are the proprietors and vendors of a medical preparation called 'The Carbolic Smoke Ball," inserted·in the *Pall Mall Gazette* of November 13, 1891, the following advertisement: '100£. reward will be paid by the Carbolic Smoke Ball Company to any person who contracts the increasing epidemic influenza colds, or any disease caused by taking cold, after having used the ball three times daily for two weeks, according to the printed directions supplied with each ball. 1000£. is deposited with the Alliance Bank, Regent Street, shewing our sincerity in the matter.

'During the last epidemic of influenza many thousand carbolic smoke balls were sold as preventives against this disease, and in no ascertained case was the disease contracted by those using the carbolic smoke ball.

'One carbolic smoke ball will last a family several months, making it the cheapest remedy in the world at the price, 10 s. post free. The ball can be refilled at a cost of 5 s. Address:

'Carbolic Smoke Ball Company,

'27, Princes Street, Hanover Square, London, W.'

"The plaintiff, a lady, having read that

advertisement, on the faith of it bought one of the defendants' carbolic smoke balls, and used it as directed three times a day, from November 20 till January 17, 1892, when she was attacked by influenza. She thereupon brought this action against the defendants to recover the 100£. promised in their advertisement."

One of the defenses was that there was no contract between the parties. The presiding judge ruled, at 488-89:

"As regards the first question, I am of opinion that the offer or proposal in the advertisement, coupled with the performance by the plaintiff of the condition, created a contract on the part of the defendants to pay the 100£. upon the happening of the event mentioned in the proposal. It seems to me that the contract may be thus described. In consideration that the plaintiff would use the carbolic smoke ball three times daily for two weeks according to printed directions supplied with the ball, the defendants would pay to her 100£. if after having so used the ball she contracted the epidemic known as influenza.

"The advertisement inserted in the *Pall Mall Gazette* in large type was undoubtedly so inserted in the hope that it would be read by all who read that journal, and the announcement that 1000£. had been deposited with the Alliance Bank could only have been inserted with the object of leading those who read it to believe that the defendants were serious in their proposal, and would fulfil their promise in the event mentioned; their own words, '*shewing our sincerity* in the matter,' state as much. It may be that, of the many readers of the advertisement, very few of the sensible ones would have entertained expectations that in the event of the smoke ball failing to act as a preventive against the disease, the defendants had any intention to fulfil their attractive and alluring promise; but it must be remembered that such advertisements do

not appeal so much to the wise and thoughtful as to the credulous and weak portions of the community; and if the vendor of an article, whether it be medicine smoke or anything else, with a view to increase its sale or use, thinks fit publicly to promise to all who buy or use it that, to those who shall not find it as surely efficacious as it is represented by him to be he will pay a substantial sum of money, he must not be surprised if occasionally he is held to his promise."

Two recent American cases have also held that one who publicly made a claim or statement, accompanied by an offer to pay money to anyone who could prove him wrong, was liable to a person who accepted the offer by proving that the offeror was wrong.

One of the cases reaches for its historical background into the 1880's, and involves the outlaw Jesse W. James, whose exploits became a virtual legend known to every school child in the country. One Rudy Turilli, operator of the "Jesse James Museum", at Stanton, Missouri, and publisher of a book titled "The Truth About Jesse James", appeared on a nationwide television broadcast in 1967. Turilli claimed that the man shot and buried in 1882 as Jesse James was an imposter, and that the real Jesse James lived, under the name of J. Frank Dalton, at Turilli's museum for many years, and died in the 1950's. Turilli announced to the network audience that he "would pay Ten Thousand Dollars to anyone * * * who could prove me wrong."

Stella James, a daughter-in-law, and her two children, granddaughters of Jesse W. James, did prove, to the satisfaction of the judge and jury in the Circuit Court, Franklin County, Missouri, that Turilli was wrong. The St. Louis Court of Appeals affirmed, in *James v. Turilli*, 473 S.W.2d 757 (Mo. App. 1971). Regarding an attack upon the sufficiency of the performance of the required act by the plaintiffs, the court said, at 762:

"As pointed out earlier, the offer of a reward is a unilateral contract which becomes complete when

accepted by performance of the act called for in the offer. A claimant to a reward needs only to show substantial performance. * * * As with other contracts, literal performance is not required."

The other "prove me wrong" case arose in the State of Washington, when Warren Treece, an officer of Vend-A-Win, a punchboard distributor, appeared before the State Gambling Commission in support of punchboard legitimacy. Treece made a statement, disseminated in the news and broadcast media, that "I'll put a hundred thousand dollars to anyone to find a crooked board. If they find it, I'll pay it." Two days later Vernon Barnes telephoned Treece, and asked if the statement had been made seriously. Treece assured Barnes that he was serious, and that the $100,000 was being held in escrow.

Barnes produced two punchboards which were rigged and dishonest. In affirming the judgment of the trial court against Treece,[4] the Court of Appeals of Washington, Division 1, in *Barnes v. Treece*, 549 P. 2d 1152 (Wash. App. 1976), said, at 1155:

> "The trial court properly categorized Treece's promise of $100,000 as a valid offer for a unilateral contract. The offer made promised that a contract would result upon performance of the act requested. Performance of the act with the intent to accept the offer constituted acceptance. The trial judge entered a specific finding that Barnes performed the requested act of acceptance when he produced a rigged and fraudulent punchboard. We concur with the trial court's holding that a binding unilateral contract was formed between Barnes and Treece and uphold the conclusions of the trial court in that regard."

---

4. Barnes also sued Vend-A-Win, Treece's corporate employer. The court held that the corporation had neither authorized nor ratified the offer made by Treece, and was not liable.

Based upon the law as we find it to be, we would have no difficulty in holding that if Rosenthal proved that Packer's offer was "not absolutely true", Packer owed Rosenthal $20,000.00. If the facts properly before Judge Allen on the motion for summary judgment presented a genuine dispute as to facts material to the question of Rosenthal's performance of the specified act, he would have been entitled to a trial on the facts at issue.

The Court of Appeals has frequently explained the proper function, Maryland Rule 610, relating to summary judgments. One of the most recent cases is *Lynx, Inc. v. Ordnance Products*, 273 Md. 1, 327 A. 2d 502 (1974), in which the Court said, at 7-8:

> "The function of the summary judgment procedure is not to try the case or decide the issues of fact raised; it is merely to determine whether or not there is an issue of fact to be tried and if there is none, to cause judgment to be rendered accordingly. * * * At the trial level, the purpose of the hearing on the motion is to decide whether a real dispute as to material facts does exist; if the pleadings, depositions, admissions and affidavits (if any) show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment should be granted. * * *

> "A bare allegation in a general way that there is a dispute as to material facts is never sufficient to defeat a motion for summary judgment. * * * General allegations which do not show facts in detail and with precision are insufficient to prevent the entry of summary judgment. * * *

> "Even where it is shown that there is a dispute as to a fact, when the resolution of that factual dispute is not material to the controversy, such dispute does not prevent the entry of summary judgment. * * * Such a material fact must be one,

the resolution of which will somehow affect the out-
come of the case. * * *

"In connection with a ruling to be made on a
motion for summary judgment the function of the
trial court is much the same as that which it
performs at the close of all the evidence in a jury
trial when motions for directed verdict or requests
for peremptory instructions require a decision as to
whether an issue requires resolution by a jury or is
to be decided by the court as a matter of law. * * *

"In reviewing the propriety of the grant of a
summary judgment we are concerned primarily
with deciding whether a factual issue which was
material to the resolution of the controversy existed
and whether the trial judge was legally correct.
* * * Where the record shows that there was no
such genuine dispute as to any material fact
necessary to resolve the controversy as a matter of
law, and it is shown that the movant is entitled to
judgment, the entry of summary judgment is
proper." [Citations omitted.]

A few of the cases which contributed to the synthesis quoted
above are *Salisbury Beauty Schools v. State Board,* 268 Md.
32, 300 A. 2d 367 (1973); *Brown v. Suburban Cadillac, Inc.,*
260 Md. 251, 272 A. 2d 42 (1971); *Vanhook v. Merchants Mut.
Ins. Co.,* 22 Md. App. 22, 321 A. 2d 540 (1974); and *Knisley v.
Keller,* 11 Md. App. 269, 273 A. 2d 624 (1971).

Before the trial court were the pleadings, interrogatories
and answers, depositions, the motion for summary
judgment, with exhibits and supporting affidavit, and the
answer to the motion, with supporting affidavit.

The factory invoice, itemized, showed that the total for the
vehicle and dealer charges was $4,035.26. The daily
transaction register of the Ford Motor Credit Company with
Al Packer Ford, Inc. showed that the invoice amount for the
car ordered by Rosenthal was $4,035.26. The Baltimore
Branch Manager of the Ford Motor Credit Company made
an affidavit that the invoice statement to Al Packer Ford,

Inc. for this car was $4,035.26 and that Al Packer Ford paid that amount.

The purchase contract between Rosenthal and Packer (the transaction in which it is claimed that Packer charged more than $89.00 over factory invoice) shows the figure "4035" to which is added "89", carried to a total "4124", and the amount "4124.00" is entered on the line "cash price of car". To this figure is added, on a lower line, an item "+ 114.00", with the description, "Remove AM Install AM FM Stereo". Under these figures are added taxes and registration fee, with a credit for a $100.00 cash deposit.

A separate exhibit shows the details of the calculation for changing the radio as it was in the car in stock, to an AM FM Stereo, ordered by Rosenthal.

The affidavit supporting the answer by Rosenthal to the motion for summary judgment said only this:

> "The affiant avers and makes oath in due form of law that there is a genuine dispute between the parties as to material facts, which are rightly matters for the jury to determine as the trier of fact in the instant case."

In an earlier affidavit Rosenthal had itemized figures related to the change of radios which suggested that Packer had charged $6.74 more than the cost of the change.

Two days after signing the purchase contract and making the deposit, Rosenthal wrote to Packer, referring to a misunderstanding about the color of the car, asking for the return of his deposit, and stating that he would consider the matter closed. On 26 June 1972 Rosenthal wrote Packer, making claim for the $20,000, "founded upon the fact that the installation of the AM-FM Stereo would take the sale well over $89.00 above the actual factory invoice in the event that one cent profit was made on the sale of this radio."

Appellant argued below and in this Court, without the support of evidentiary facts, that there could have been a profit to Packer in the charge of $114.00 made for the changing of radios, and that certain items referred to as

"holdbacks" on the factory invoice suggest that the ultimate cost of the car to Packer may have been less than the factory invoice price.

Neither argument is sufficient to raise a genuine dispute of material fact, so as to defeat the motion for summary judgment. The additional charge for additional equipment ordered by the purchaser of the car was separate and distinct from the sale of the car, "sold from stock" for "$89 over factory invoice." Whether there was or was not a profit in the $114.00 radio charge could have no effect upon the "absolute truth" of Packer's basic offer.

There is nothing in this record to suggest the meaning of the term "holdback", but even if we assume that it may represent a potential future benefit to the dealer, Packer's offer was to sell for $89.00 over factory invoice price. A mere glance at the factory invoice and Rosenthal's purchase contract shows that Packer did what it offered to do.

The attempted "acceptance" of Packer's offer to pay $20,000 was not effective, and did not create a contractual obligation by Packer to pay the $20,000.

*Judgment affirmed.*
*Appellant to pay costs.*