PUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SHARP ELECTRONICS CORPORATION,
Plaintiff-Appellee,

v.

DEUTSCHE FINANCIAL SERVICES
CORPORATION,
Defendant-Appellant.

No. 99-1555

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CA-98-253-AMD)

Argued: April 6, 2000

Decided: June 20, 2000

Before NIEMEYER, Circuit Judge, Roger J. MINER,
Senior Circuit Judge of the United States Court of Appeals
for the Second Circuit, sitting by designation, and
Joseph R. GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Vacated and remanded by published opinion. Judge Niemeyer wrote
the opinion, in which Senior Judge Miner and Judge Goodwin joined.

_____

**COUNSEL**

**ARGUED:** Peter Neil Wang, FRIEDMAN, WANG & BLEIBERG,
P.C., New York, New York, for Appellant. Anthony Linn Meagher,

PIPER & MARBURY, L.L.P., Baltimore, Maryland, for Appellee.
**ON BRIEF:** Timothy F. McCormack, David E. Ralph, E. Benjamin Alliker, GORDON, FEINBLATT, ROTHMAN, HOFFBERGER & HOLLANDER, L.L.C., Baltimore, Maryland, for Appellant. Henry R. Lord, Brett Ingerman, PIPER & MARBURY, L.L.P., Baltimore, Maryland, for Appellee.

_____

## OPINION

NIEMEYER, Circuit Judge:

This appeal presents the question under Illinois law of whether a finance company may unilaterally modify the terms of a standing floorplan financing agreement before it agrees to finance a given transaction. Because we hold that the floorplan financing agreement in this case was a unilateral contract that did not bind the finance company until it undertook to finance a specific transaction, we conclude that the finance company could, as a condition of continuing under the arrangement, modify the terms under which it was willing to continue to finance transactions. Accordingly, we vacate the district court's judgment entered against the finance company after it refused to finance a $1.3 million transaction except on terms that it had unilaterally demanded and remand with instructions as specified herein.

I

Deutsche Financial Services Corporation ("Deutsche Financial") and Sharp Electronics Corporation ("Sharp") signed a financing agreement, entitled "Floorplan Repurchase Agreement," which provided that if Deutsche Financial would agree from time to time to finance certain transactions between Sharp and its wholesale customers, Sharp would reduce Deutsche Financial's risk by repurchasing any financed merchandise that Deutsche Financial might find necessary to repossess upon default. The agreement was unilateral in that Sharp offered Deutsche Financial inducements -- specifically agreements to reduce its risk -- to provide financing for ongoing transactions between Sharp and its customers, in this case Montgomery

2

Ward & Co., Incorporated ("Montgomery Ward"), but Deutsche Financial was not obligated to provide any financing. The agreement simply invited Deutsche Financial to accept the inducements by providing the financing.

In particular the agreement provided: "To induce[Deutsche Financial] to finance the acquisition of Merchandise by any [customer of Sharp]," Sharp agrees that

> (1) It will assure that the underlying transaction is current and authentic; that the merchandise is "free and clear of all liens"; and that the merchandise is saleable;

> (2) It will assign to Deutsche Financial "the vendor's privilege and lien" on merchandise as granted under Louisiana law;

> (3) It will "repurchase such Merchandise from[Deutsche Financial] upon demand" and for specified prices whenever Deutsche Financial will have a need to repossess the merchandise from customers in default.

And while the agreement invited Deutsche Financial to finance transactions in response to Sharp's assurances, it specifically did not require Deutsche Financial to finance any transaction, providing, "This Agreement shall in no way bind [Deutsche Financial] to finance any Merchandise for [Sharp's] retail dealers. From time to time [Sharp] will inquire as to whether [Deutsche Financial] agree[s] to finance Merchandise for certain dealers." Under the agreement, Deutsche Financial would be invited to respond to applications or "requests" made by both Sharp and Montgomery Ward. Only after Deutsche Financial approved a specific request to finance a transaction would it become obligated to complete performance under the terms of the Floorplan Repurchase Agreement by paying the invoice amount of the proposed transaction less agreed-upon finance charges. This obligation to pay, however, was conditioned on (1) Sharp's shipment of the merchandise to Montgomery Ward within 30 days of Deutsche Financial's approval and (2) Deutsche Financial's receipt of the invoice for the transaction within 10 days after delivery of the merchandise.

3

Underlying Deutsche Financial's willingness to approve financing under the Floorplan Repurchase Agreement for Montgomery Ward's purchases from Sharp was Deutsche Financial's independently defined role as administrator of a financial "facility" for Montgomery Ward that provided Montgomery Ward with a $100 million line of credit.

Until November 1996, the practice under the Floorplan Repurchase Agreement between Deutsche Financial and Sharp with respect to Montgomery Ward's purchases routinely took the following form: Montgomery Ward would place a purchase order for merchandise with Sharp; Sharp would call Deutsche Financial and request an approval number for the financing of the merchandise; and Deutsche Financial would, if it elected to finance the transaction and if Montgomery Ward had not yet reached its credit limit with Deutsche Financial, orally issue Sharp an approval number. In November 1996, the arrangement changed slightly. Thereafter, Sharp would fax Deutsche Financial its financing request, and Deutsche Financial would fax its approval to Sharp. Sharp would then enter the approval number into its computer system, ship the merchandise to Montgomery Ward, and send the invoice to Deutsche Financial, which would pay Sharp.

In early May 1997, in response to its deteriorating financial condition, Montgomery Ward met with its suppliers to discuss its condition and its plans to restructure. As part of these plans, Montgomery Ward announced its intention to transfer the administration of its line of credit from Deutsche Financial to General Electric Capital Corporation, a shareholder of Montgomery Ward. Upon the accomplishment of that transfer, Deutsche Financial would no longer be financing any Montgomery Ward purchases, including those from Sharp. No representative of Sharp attended this meeting, but Sharp's general manager learned of it later. He also was aware that General Electric Capital had been "getting more involved" with Montgomery Ward and that it might "step in either as the lender or the administrator of the floor plan program." Based on this knowledge, Sharp's general manager recognized the possibility that Sharp "would be requested to do something different" with regard to the financing of its sales to Montgomery Ward.

4

Sharp first received formal notice of a change in Montgomery Ward's financing arrangements on May 22, 1997, when Montgomery Ward faxed it a letter stating: "Effective May 23, 1997, the administrator on the inventory finance facility is being changed from Deutsche Financial Services to GE Capital. Deutsche will not issue approval numbers after May 23, 1997. . . . A copy of GE Capital's boilerplate Inventory Repurchase Agreement will be faxed to you on Friday, May 23, 1997." On May 23, 1997, Deutsche Financial also faxed a letter to Sharp, which Sharp received at 2:17 p.m., announcing the termination of its financing role and setting deadlines for future transactions in light of that termination. Deutsche Financial's fax, which was entirely consistent with Montgomery Ward's fax, stated in pertinent part:

> Per Montgomery Ward's request, the financing program between [Deutsche Financial and] Montgomery Ward . . . will change administrators on May 23, 1997, 5:00 PM CST. [Deutsche Financial] will continue to review your requests for approval numbers until such time, and will continue to administer the Program for any invoices dated May 28, 1997 and earlier. However, any requests for approvals after May 23, 1997 should be processed through General Electric Capital Corporation . . . who will act as the new administrator of the Program.

> As [Deutsche Financial] will not administer any invoices dated later than May 28, 1997, [Deutsche Financial] hereby notifies you that [Deutsche Financial] will revoke each approval number which [Deutsche Financial] has issued for inventory which you have not shipped to Montgomery Ward . . . on or before such date.

For purposes of this case, the important change announced by Deutsche Financial in its May 23 fax was the shortened shipping deadline requiring that merchandise be shipped to Montgomery Ward by May 28, rather than within 30 days of financing approval. Although both Montgomery Ward's May 22 fax and Deutsche Financial's May 23 fax were sent to Sharp's general manager, it was Sharp's credit administrator who, on May 23, undertook ongoing correspondence about specific transactions with his counterpart at

5

Deutsche Financial. Sharp's credit administrator states that on May 23 he remained unaware of the faxes from Montgomery Ward and Deutsche Financial announcing the termination of Deutsche Financial's financing role.

Five minutes after Deutsche Financial sent its fax to Sharp's general manager changing the terms under which it would continue to finance transactions, Deutsche Financial faxed Sharp's credit administrator an approval to finance merchandise worth $56,683, for which Sharp had submitted a request for financing approval four days earlier. In this routine fax to Sharp, Deutsche Financial did not make reference to any of the changes transmitted earlier to Sharp's general manager. Less than 30 minutes later, at 2:44 p.m., Sharp's credit administrator submitted a new request to Deutsche Financial to approve financing for almost $2.2 million worth of merchandise that Montgomery Ward had ordered. Later that same day, at 4:05 p.m., Deutsche Financial returned a fax approving the financing of this $2.2 million transaction. Again, Deutsche Financial's approval did not make reference to the changes in the financing arrangement.

Because Sharp's general manager had been on vacation on May 23, 1997, he did not see the two faxes, one from Montgomery Ward and the other from Deutsche Financial, announcing changes in the financing relationship, until May 27. On that day, after reading Deutsche Financial's May 23 fax, Sharp's general manager discussed the changes in financing procedures with Sharp's credit administrator, although the general manager later conceded he "wasn't focused" on the statement in Deutsche Financial's letter notifying Sharp that Deutsche Financial would "revoke each approval number which it has issued for inventory which [Sharp has] not shipped to Montgomery Ward . . . on or before [the May 28 deadline]."

On May 28, Sharp shipped Montgomery Ward $945,488 worth of merchandise that had been approved for financing by Deutsche Financial on May 23. The remaining $1.3 million worth of merchandise that had also been approved on May 23 was shipped on May 31, three days after the deadline imposed by Deutsche Financial in its May 23 fax. When Sharp submitted invoices for these two shipments, Deutsche Financial financed the merchandise shipped on May 28 but refused to finance the shipment made on May 31. Because Montgom-

ery Ward later defaulted on its obligation to pay Sharp for the merchandise and subsequently filed for bankruptcy, Sharp was not paid for approximately $1.3 million worth of merchandise.

In January 1998, Sharp filed this diversity-jurisdiction action against Deutsche Financial for breach of the Floorplan Repurchase Agreement. It alleged that it had complied with the agreement and that Deutsche Financial's attempted modification of the agreement on May 23, 1997, was invalid. Sharp demanded more than $1.3 million in damages, the value of the merchandise shipped on May 31, 1997, plus interest and costs.

On Sharp's motion for summary judgment, the district court entered judgment in favor of Sharp in the amount of $1,394,705.11, which included approximately $97,000 of prejudgment interest. In ruling in Sharp's favor, the court concluded that Deutsche Financial had breached the Floorplan Repurchase Agreement with Sharp. The district court, applying Illinois law because Deutsche Financial had received and approved Sharp's request to finance the $2.2 million transaction (which included the $1.3 million shipment) in that state, ruled that the agreement between the parties had not been effectively modified because a valid modification requires an offer, acceptance, and consideration. The court found that in the circumstances before it: (1) Deutsche Financial's attempted modification was not supported by valid consideration because Deutsche Financial had preexisting obligations, and (2) Sharp had not accepted Deutsche Financial's offer by performance because Sharp's actions were consistent with the preexisting agreement. In response to Deutsche Financial's argument that Sharp had failed to mitigate its damages by shipping the merchandise to Montgomery Ward after the May 28 deadline with full knowledge of the deadline, the court concluded that Deutsche Financial had not notified Sharp in its May 23 fax of an unequivocal intention to breach the existing arrangement.

This appeal followed.

II

In the broadest view, the Floorplan Repurchase Agreement in this case was an agreement between the parties establishing the underly-

7

ing terms that would apply if and when Deutsche Financial agreed to finance a transaction. Until Deutsche Financial "approved" a transaction for financing, it had no obligation to finance any transaction. Similarly, Sharp had no obligation to request Deutsche Financial's financing, although it did have the obligations set forth in the Floorplan Repurchase Agreement if Deutsche Financial approved a request. Thus, even if Sharp met all the criteria established for approval of a transaction, it could not compel Deutsche Financial to agree to finance any transaction; it could not even demand an explanation if Deutsche Financial refused to approve a transaction.

Stated otherwise, the Floorplan Repurchase Agreement was a set of terms offered by Sharp to "induce" -- the term used in the document -- Deutsche Financial to agree to finance transactions by reducing Deutsche Financial's credit risk and shifting some of that risk to Sharp through Sharp's agreement to repurchase repossessed inventory, hence the agreement's title, Floorplan Repurchase Agreement. Deutsche Financial's risk was also lessened by Sharp's assurances that a current, bona fide transaction was being financed; that the merchandise being financed was saleable; and that Sharp would assign certain vendor's rights to Deutsche Financial.

In contractual terms, the Floorplan Repurchase Agreement was a unilateral promise by Sharp that invited Deutsche Financial's acceptance by performance -- i.e., by financing transactions. Traditionally, this type of arrangement is characterized as a unilateral contract, a contract in which the promise is binding only on the promisor. See, e.g., Central Nat'l Bank & Trust Co. v. Consumers Constr. Co., 282 N.E.2d 158, 162 (Ill. App. 1972) (recognizing that a unilateral contract may be accepted by performance); E. Allan Farnsworth, Contracts § 3.4, at 115 (2d ed. 1990) ("In forming a unilateral contract only one party makes a promise: the offeror makes the promise contained in the offer, and the offeree renders some performance as acceptance"); 1 Samuel Williston, A Treatise on the Law of Contracts § 1:17, at 44-46 (Richard A. Lord ed., 4th ed. 1990). But, because this "unilateral" classification has often produced confusion in the analysis of hybrid situations, the Restatement (Second) of Contracts has abandoned rigid characterizations based on the term and has described the traditional unilateral contract in other ways under various subjects. See, e.g., Restatement (Second) of Contracts § 1 cmt. f (1981)

8

(Reporter's Note) (explaining that because "unilateral contract" traditionally referred to three different types of transactions, the term was "productive of confusion"); id. § 25 (option contracts); id. § 30(1) (offers inviting acceptance by performance); see also Lomas Mortgage U.S.A., Inc. v. W.E. O'Neil Constr. Co., 812 F. Supp. 841, 843 (N.D. Ill. 1993) (citing Illinois cases that rely on the Restatement (Second) of Contracts and noting that Illinois courts "customarily" follow them). The flexible approach recommended by the Second Restatement, while more adaptable to various types of transactions, does not abandon the traditional notion that under a unilateral contract, as long as the promisor holds open his offer inviting acceptance by performance, the promisee can bind the promisor by such performance. See Restatement (Second) of Contracts§ 53(1) (acceptance by performance); id. § 54(1) (when offer is accepted by performance, no notification of acceptance required); see also 1 Williston § 1:17, at 45. While principles of "purely" unilateral contracts are most often applied to offers of a reward or of a price for goods or services, id. § 1:17, at 44-45, they also apply to financing, such as credit-card financing, where the finance company, through the provision of an underlying unilateral agreement, makes an offer to finance its customer's purchases of merchandise if the customer uses the card. Until the customer uses the card, the finance company may cancel its financing offer. But once a customer uses the card to make a purchase, the finance company becomes obligated to finance that purchase. See Garber v. Harris Trust & Sav. Bank, 432 N.E.2d 1309, 1311 (Ill. App. 1982) (holding that issuance of a credit card is only an offer to extend credit, which is accepted upon each purchase by credit-card owner).

These well-established contract principles readily describe and govern this case. Until Deutsche Financial accepted Sharp's offer by beginning its performance, i.e., by agreeing to finance a transaction, Sharp could have withdrawn from the arrangement or altered the terms of its offer to Deutsche Financial. And this freedom from obligation continued even after Sharp submitted a request for approval, so long as Deutsche Financial had not given its approval. See, e.g., Andros v. Hansen Realty Co., 358 N.E.2d 664, 667 (Ill. App. 1976) ("a unilateral agreement can be cancelled at any time before performance by the other party"). Similarly, at any time before its approval, Deutsche Financial could have demanded different assurances or

9

terms as a condition to future financing. If Sharp refused, Deutsche Financial could have correspondingly refused to finance any transaction and withdrawn from the arrangement. See, e.g., Western Springs Park Dist. v. Lawrence, 175 N.E. 579, 580 (Ill. 1931) (recognizing that offer is not binding until acceptance). Until Deutsche Financial approved a specific request, either party could cancel the arrangement or condition its participation in future transactions.

When Deutsche Financial approved a transaction for financing, however, it began its performance, thereby accepting Sharp's offer and binding Sharp to the terms of the offer. Deutsche Financial similarly bound itself to complete performance by agreeing to finance the transaction under the terms of the underlying arrangement. The Floorplan Repurchase Agreement makes this explicit:

> Upon [Deutsche Financial's] approval to provide such financing, via telephone or other means, [Deutsche Financial] will be obligated to pay [Sharp] an amount equal to the invoice price for such Merchandise, less the amount of [Deutsche Financial's] charges as agreed upon from time to time, if the Merchandise is shipped to the dealer within thirty (30) days from the date of [Deutsche Financial's] approval and [Deutsche Financial has] received [Sharp's] invoice for such Merchandise within ten (10) days from the date of delivery of the Merchandise to the dealer.

(Emphasis added). While Deutsche Financial, with its approval of Sharp's request, became obligated to finance the transaction, its completion of performance -- its payment for the merchandise -- was nevertheless required only if (1) Sharp shipped the merchandise to Montgomery Ward within 30 days of its approval and (2) Deutsche Financial received an invoice for the merchandise within 10 days after delivery.

In the parlance of contract law, Deutsche Financial's obligation to complete performance -- by financing the transaction after its approval -- was subject to conditions. The Restatement defines a condition as "an event, not certain to occur, which must occur . . . before performance under a contract becomes due" and notes that "[p]erformance of a duty subject to a condition cannot become due

10

unless the condition occurs." Restatement (Second) of Contracts §§ 224, 225(1). As such, although Deutsche Financial's approval constituted acceptance through performance, such approval was merely partial performance, and Deutsche Financial's complete performance was conditional on additional acts by Sharp. See Vuagniaux v. Korte, 652 N.E.2d 840, 842-43 (Ill. App. 1995) (discussing conditions which, if not fulfilled, preclude contractual liability).

On May 23, 1997, before Deutsche Financial approved any transaction and therefore before it became obligated to do anything under the Floorplan Repurchase Agreement, Deutsche Financial announced that any future financing would be subject to new conditions -- pertinently, the requirement of shipment within 30 days became a requirement of shipment by May 28. Because this May 23 fax controlled Deutsche Financial's future acceptance of Sharp's standing offer (represented by the Floorplan Repurchase Agreement) and because Deutsche Financial purported to condition acceptance of the offer on the condition that its changes be made, the May 23 fax must be treated as a rejection of Sharp's standing offer and as a counteroffer on new terms. See Hubble v. O'Connor, 684 N.E.2d 816, 821 (Ill. App. 1997) ("An acceptance conditioned on the modification of terms in an offer generally constitutes a rejection of the offer and becomes a counter-offer that the original offeror must accept before a valid contract is established"); Restatement (Second) of Contracts § 59 ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer"); id. § 36(1)(a) (indicating that a counteroffer by the offeree may terminate the offeree's power to accept the original offer); id. § 39 (defining a counteroffer as "an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer").

The role of the Floorplan Repurchase Agreement as a standing offer to enter into a number of financing contracts does not alter this analysis. See Restatement (Second) of Contracts § 31 ("An offer may propose . . . the formation of a number of contracts by successive acceptances from time to time"). This is because individual contracts formed on the underlying offer for multiple contracts are analyzed individually as divisible contracts. See Restatement (Second) of Con-

11

tracts § 47 (indicating that a standing offer contemplating "a series of independent contracts" may be revoked "so as to terminate the power to create future contracts," even though other contracts have already been entered into pursuant to the standing offer); see also Kling Bros. Engineering Works v. Whiting Corp., 51 N.E.2d 1004, 1008 (Ill. App. 1943) ("an offer of . . . divisible character may be revoked not only before any acceptance but also as to any portion of the offer still unaccepted").

The nature of Deutsche Financial's counteroffer included in the May 23 fax was clear. Deutsche Financial was terminating its underlying financing relationship with Montgomery Ward and would no longer approve transactions for financing after May 23. Deutsche Financial further indicated that it would not finance any transaction with an invoice date or shipment date after May 28. In essence, Deutsche Financial was offering to continue for a short time under the underlying Floorplan Repurchase Agreement as long as its new conditions applied, and it was inviting Sharp and Montgomery Ward to submit new transactions for financing subject to those conditions. In contract language, Deutsche Financial extended a counteroffer to Sharp that could be accepted by Sharp's performance-- i.e., by Sharp's further submission of financing requests.

The legal effect of Deutsche Financial's May 23 counteroffer was rejection of Sharp's standing offer, which terminated Deutsche Financial's ability to bind Sharp on the original terms. See Restatement (Second) of Contracts § 36; see also OnTap Premium Quality Waters, Inc. v. Bank of N. Ill., 634 N.E.2d 425, 429 (Ill. App. 1994) ("It is well established that an acceptance requiring any modification or change of terms constitutes a rejection of an original offer"); Sementa v. Tylman, 595 N.E.2d 688, 692 (Ill. App. 1992) ("A rejected offer cannot be revived by a later acceptance"). Thus, the original terms of the Floorplan Repurchase Agreement were terminated, and neither party could unilaterally revive it.

Deutsche Financial's May 23 rejection of the standing offer in the Floorplan Repurchase Agreement and its termination of its own power of acceptance occurred upon Sharp's receipt of the counteroffer from Deutsche Financial, not when knowledge of the communication's contents could be imputed to the addressee or anyone else. See

12

Restatement (Second) of Contracts § 40 (counteroffer terminates the power of acceptance when "received" by the original offeror); id. § 68 (receipt occurs when the "writing comes into the possession of the person addressed, or some person authorized by him to receive it for him, or when it is deposited in some place which he has authorized as the place for this or similar communications to be deposited for him"). Identifying receipt as the objective manifestation of when rejection occurs is necessary for determining contracting liability. It permits an offeror an objective mechanism to revoke an offer and, similarly, permits an objective mechanism by which an offeree can reject an offer. In these circumstances, receipt leads not to the formation of a contract, but to its demise, and therefore, knowledge of the contents of a communication, which otherwise might be necessary for a meeting of minds to form a contract, need not be imputed to the parties for the revocation or rejection of an offer to become effective.

In sum, Deutsche Financial effectively rejected the standing Floorplan Repurchase Agreement -- which may essentially be understood as a termination unless Sharp agreed to new conditions -- at 2:17 p.m. on May 23 when the fax was received by Sharp, addressed to its general manager. This was the person with whom communications between the companies regarding the terms of the Floorplan Repurchase Agreement had taken place; the general manager was also the person to whom Montgomery Ward sent its fax a day earlier announcing the termination of its relationship with Deutsche Financial. See Restatement (Second) of Contracts § 68 & cmt. a (noting that receipt of a communication does not require that it have been read or even that it have reached the hands of the addressee). Thus, unless Sharp thereafter acceded to the new conditions demanded by Deutsche Financial -- or, stated otherwise, unless Sharp accepted Deutsche Financial's counteroffer of May 23 -- the Floorplan Repurchase Agreement came to an end on May 23 when Sharp received Deutsche Financial's fax.

Sharp does not appear to take issue with this conclusion. It agrees that Deutsche Financial's May 23 fax contained a counteroffer but argues that it never agreed to the new conditions contained in the fax. Sharp's core argument is that it cannot be deemed to have accepted Deutsche Financial's counteroffer without an awareness of the fax's contents. It contends that at the time it requested Deutsche Financial's

13

approval for ongoing financing later on May 23, it did not have effective notice of the modifications demanded by Deutsche Financial. In support of this contention, Sharp gives three reasons why notice was defective. First, Sharp contends that notice of the counteroffer was inadequate because it was received less than one-half hour before Sharp requested approval for the $2.2 million transaction. Second, it points out that Deutsche Financial's fax was sent to Sharp's general manager, whereas it was Sharp's credit administrator who processed financing approvals. Finally, it notes that the general manager, to whom the May 23 fax was sent, did not receive actual notice of it until four days later, on May 27 when he returned from vacation.

Sharp may have identified a legitimate factual question about whether it had effective notice of the contents of Deutsche Financial's counteroffer so as to be able to accept it by performance that same day. This factual issue, however, need not be resolved. Rather, because of Sharp's actual knowledge of the counteroffer on May 27 and its performance thereafter in shipping $2.2 million worth of merchandise to Montgomery Ward, this case may be decided as a matter of law on an established principle of contract law.

When an offeree, who has performed partly, continues performance requested by the offer after learning of the offer, it accepts the offer by completing the requested performance, even if it did not know of the offer when it first began to perform. See Restatement (Second) of Contracts § 51 ("Unless the offeror manifests a contrary intention, an offeree who learns of an offer after he has rendered part of the performance requested by the offer may accept by completing the requested performance"); see also Plumb v. Campbell, 18 N.E. 790, 792 (Ill. 1888) (party can be bound to unilateral contract "in [any] of three ways: First, by . . . engaging within a reasonable time to perform the contract on his part; second, by beginning such performance in a way which would bind him to complete it; and, third, by actual performance"); In re Marriage of Sherrick, 573 N.E.2d 335, 337 (Ill. App. 1991) ("Conduct, including an acceptance of benefits under a contract, may be sufficient to constitute a ratification binding on the party accepting the benefits as if the party had signed the contract"). This principle embodied in § 51 of the Restatement resolves the case at hand. Even if Sharp began the performance invited by Deutsche Financial's counteroffer by requesting the $2.2 million of financing

14

without knowledge that the "old deal" had been terminated and that new conditions had been demanded, its core actions continuing performance in the manner invited by the offer -- i.e., the shipping of merchandise -- occurred after it had actual knowledge of Deutsche Financial's counteroffer. Sharp does not dispute that by May 27, its general manager had actually read Deutsche Financial's fax and discussed it with Sharp's credit administrator. And at that point, Sharp could have withdrawn from Deutsche Financial's proposed arrangement and refused to ship any merchandise without risk. Sharp's general manager had become aware that the old deal was done and that Sharp could continue only under the counteroffer. But instead of indicating its nonagreement with the counteroffer, Sharp began shipping all of the merchandise covered by the approved $2.2 million transaction, with full notice of Deutsche Financial's May 28 deadline. Some merchandise was shipped on May 28 within the deadline, but $1.3 million worth of merchandise was shipped on May 31, after the May 28 deadline. In short, the record indisputably establishes that at the time Sharp began shipping the $2.2 million worth of merchandise to Montgomery Ward -- $1.3 million worth of which it seeks reimbursement in this suit -- it had actual notice of Deutsche Financial's counteroffer. Nevertheless, it elected to continue its performance, thereby accepting that counteroffer.

Accordingly, we hold that the financing that was approved after Sharp received Deutsche Financial's May 23 fax is governed by the terms of the May 23 fax and that Deutsche Financial therefore did not breach the Floorplan Repurchase Agreement when it refused to finance the $1.3 million worth of merchandise Sharp shipped after May 28, contrary to the conditions offered on May 23 and accepted by Sharp's continuing performance.

The equities of this situation also militate against any different conclusion. Sharp was aware that Deutsche Financial was withdrawing its financial support from Montgomery Ward and that General Electric Capital Corporation might replace it. Sharp also received actual notice on May 27, if not before, that the transition from Deutsche Financial to General Electric Capital would be effective May 28 and that Deutsche Financial would not be financing any shipments made after that date. Sharp thus plainly assumed the risk that Montgomery Ward would not be able to pay for the merchandise that it had ordered and

15

that Sharp shipped on May 31. The fact that Sharp consciously undertook that risk is indicated by further unrelated transactions for the sale of merchandise that Sharp entered into directly with Montgomery Ward after May 28. It would challenge any notion of fairness to let Sharp shed the risk it assumed of Montgomery Ward's poor credit now that Montgomery Ward has filed a petition in bankruptcy.

Our determination that Deutsche Financial was not contractually obligated to finance the $1.3 million worth of merchandise, which formed the basis for Sharp's claim, leads to the legal conclusion that, on Sharp's complaint and the undisputed facts of record, Deutsche Financial is entitled to judgment as a matter of law. Accordingly, we vacate the district court's judgment and remand with instructions to enter judgment in favor of Deutsche Financial.

VACATED AND REMANDED WITH INSTRUCTIONS