797 A.2d 824

**NRT MID–ATLANTIC, INC., et al. t/a
O'Connor, Piper & Flynn/Era,**

v.

**INNOVATIVE PROPERTIES, INC.**

**No. 951, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

May 6, 2002.

264

266

268

Gerard G. Magrogan (Monshower, Miller & Magrogan, LLP, on brief) Columbia, for appellant.

Steven R. Migdal (Christopher D. Buck, Buck, Migdal & Myers, Chtd., on brief) Annapolis, for appellee.

Argued before KENNEY, DEBORAH S. EYLER, MARVIN H. SMITH, (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

The Circuit Court for Anne Arundel County denied a motion to stay and petition to compel arbitration filed by NRT Mid–Atlantic, Inc. t/a O'Connor, Piper & Flynn/ERA ("OPF"), one of the appellants, in a suit brought against it and against Robert M. Beall and Margaret K. Beall, the other appellants, by Innovative Properties, Inc. ("Innovative"), the appellee. OPF noted this interlocutory appeal, presenting two questions for review, which we have combined and rephrased as follows:

> Did the circuit court err in concluding that the claims asserted by Innovative were not within the scope of the parties' arbitration agreement, and denying the motion to stay and petition to compel arbitration on that basis?

For the following reasons, we shall vacate the order of the circuit court.

## FACTS AND PROCEEDINGS

Our recitation of the alleged facts is based on the amended complaint filed by Innovative and undisputed facts presented to the circuit court in the motion to stay and petition to compel arbitration.[1]

OPF and Innovative are real estate brokerage companies. On September 29, 2000, OPF entered into an "Exclusive Right To Sell Listing Contract" ("Listing Contract") with the owner

---

1. In the original complaint, Innovative named OPF and Ledo Pizza Systems, Inc., as defendants. In the amended complaint, Innovative dropped Ledo Pizza Systems, Inc., as a defendant and added Beall, Sr., and Mrs. Beall as defendants.

of certain commercial property located outside the City of Annapolis, in Anne Arundel County ("the Property").

The Listing Contract authorized OPF to market and sell the Property and provided that, upon the satisfaction of certain conditions, the owner would pay OPF a commission of 4% of the sales price for marketing and negotiating and an additional 4% of the sales price for selling services. The Listing Contract authorized OPF to cooperate with other real estate brokers, either as subagents of OPF or as buyer's agents, and provided that OPF "shall pay" to any subagent or buyer's agent "who has earned and is entitled to share in the fee" the one-half of the 8% commission denoted for "selling services." The Listing Contract also authorized OPF to use the Multiple Listing Service ("MLS") to advertise the Property.

OPF placed the Property on the MLS on October 10, 2000. The MLS listing described the Property and gave the name of the OPF listing agent and of James Hoffman, an OPF agent with information about, and access to, the Property. In addition, the MLS listing stated, "Sub Comp 4" and "Buy Comp 4," meaning that subagents and buyer's agents were being offered a 4% sales commission to bring the buyer to the Property, i.e., to be the procuring cause of the sale of the Property.

On October 23, 2000, Richard Neville, a Maryland real estate agent associated with Innovative, contacted Hoffman, at OPF, about the Property. Hoffman provided Neville with written materials about the Property. Neville organized the materials, distilled the financial information from them, and put them in a form to distribute to prospective purchasers.

A week later, on October 30, 2000, Neville had a conversation with Robert M. Beall, Jr., the son of appellants Robert M. Beall, Sr., and Margaret Beall. Beall, Jr. was representing his parents in their search for new office space for their company, Ledo Pizza System, Inc. ("Ledo"). In that conversation, Neville told Beall, Jr. that the Property was for sale, and agreed to furnish him with information about it. On

November 2, 2000, Neville sent written information about the Property to Beall, Jr., by facsimile.

The next day, November 3, Neville received a telephone call from Beall, Sr., who said he personally would be making the decisions for Ledo's about purchasing property for office space. Beall, Sr. advised Neville that he had read the materials Neville had faxed to Beall, Jr., and was very interested in the Property. Beall, Sr. explained, however, that he was leaving the next day for Florida and would be away for about two weeks. He said that upon his return he would call Neville for the purpose of submitting an offer to purchase the Property.

Several weeks passed and Neville did not hear from Beall, Sr. (or Jr.). On November 27, 2000, Neville called Beall, Sr. who said he had lost Neville's telephone number and so he had called the OPF listing agent on the Property directly and had made an offer on it. The offer had not yet been accepted.

Immediately thereafter, Neville sent a facsimile to Hoffman stating that he had introduced the Bealls to the Property, and asking OPF to acknowledge that he was a cooperating broker; he also left a telephone message to the same effect. OPF did not respond to either the facsimile or the telephone message. For the next two weeks, Neville made several more telephone calls to OPF communicating the same information, but none were returned.

On December 11, 2000, Neville contacted Beall, Sr., and was told that the Bealls already had signed a contract to purchase the Property, subject to a thirty day feasibility study period.

On January 22, 2001, the Bealls purchased the Property. OPF received the entire 8% commission on the sale, which allegedly came to $64,000.

According to Innovative, it introduced the buyers (the Bealls) to the Property through Neville and was the procuring cause of the sale. Therefore, it was a cooperating broker that was entitled to receive a 4% sales commission on the Property,

that is, $32,000. Innovative made numerous demands upon OPF for payment of that sum, but the demands were refused.

In its amended complaint, Innovative asserted three causes of action. In Count I, it sought recovery for "Unjust Enrichment." It alleged that OPF knew that it had introduced the Bealls to the Property and therefore was a cooperating broker that was entitled to a 4% sales commission; nevertheless, OPF retained the full commission for itself, thereby unjustly enriching itself in the amount of $32,000. Innovative sought to recover that sum from OPF.

In Count II, Innovative sought recovery for "Interference With Business Relations." It alleged that OPF and the Bealls knew that Innovative had introduced the Bealls to the Property and had given them important information about the Property, and further knew that Innovative expected to receive the 4% sales commission owed to a cooperating broker. Nevertheless, and for the purpose of depriving Innovative of its share of the commission, they excluded Innovative from the transaction. This conduct amounted to an intentional interference with Innovative's economic rights, without justifiable cause or right. Innovative alleged that it had suffered actual damages of $32,000, and sought that sum from OPF and the Bealls, jointly and severally.

Finally, in Count III, Innovative sought recovery for "Conspiracy." It alleged that OPF and the Bealls had conspired to exclude it from the transaction for the purpose of depriving it of its 4% commission as a cooperating broker, and as a result, it was damaged in the amount of $32,000. It sought to recover that sum from OPF and the Bealls, jointly and severally.

OPF filed a motion to stay and petition to compel arbitration, pursuant to Md.Code (Supp.1998, Repl.2001) sections 3–207 and 3–209 of the Courts and Judicial Proceedings Article ("CJ"). It alleged that Innovative and OPF, through their brokers of record, belong to the Anne Arundel County Association of REALTORS® ("Association"); and the By–Laws of that organization require members to abide by the *Code of*

*Ethics and Arbitration Manual* ("Manual") of the National Association of REALTORS®.[2] The Code imposes a duty on members to submit certain disputes between them to binding arbitration. OPF further alleged that the dispute between the parties falls within the scope of that binding arbitration agreement. Finally, OPF asserted that Innovative was refusing to submit the dispute to arbitration, as it was required to do. OPF asked the circuit court to stay the case and compel Innovative to submit to binding arbitration.

Innovative did not contest that the parties's membership in the Association constituted an agreement to submit certain disputes between them to binding arbitration. It opposed the motion to stay and petition to compel arbitration, however, on the ground that its claims did not fall within the scope of the parties' arbitration agreement.

The court held a hearing and took the matter under advisement. On June 18, 2001, it issued an order denying the motion to stay and petition to compel arbitration. It ruled that Innovative's claims were not subject to arbitration because the parties' arbitration agreement required arbitration of "contractual disputes," and Innovative's claims were causes of action in tort, not contractual disputes.

OPF noted an appeal from the order denying its motion to stay and petition to compel arbitration.

We will include additional relevant facts in our discussion of the question presented.

## DISCUSSION

### (i)

Because this appeal is taken from an interlocutory order, we must address whether we have jurisdiction over it.

■ CJ section 12–301 provides that a party may appeal to this Court from a "final judgment." A final judgment is "a

---

2. The Manual is incorporated by reference in the Association's By-Laws.

judgment, decree, sentence, order, determination, decision, or other action by a court, including an orphans' court, from which an appeal, application for leave to appeal, or petition for certiorari may be taken." CJ § 12–101(f); *Cant v. Bartlett,* 292 Md. 611, 614, 440 A.2d 388 (1982).

It is well established that "the underlying policy of the final judgment rule is that piecemeal appeals are disfavored." *Cant v. Bartlett, supra,* 292 Md. at 614, 440 A.2d 388. As we have recognized, "it is ultimately a question for [the Court of Appeals] to decide which judgments or orders are final and therefore appealable under section 12–301." *Ashcraft & Gerel v. Shaw,* 126 Md.App. 325, 340, 728 A.2d 798 (1999)(holding that an order requiring a party to disclose documents in its possession is presently appealable under a final judgment analysis or in the alternative as a collateral order)(quoting *Peat, Marwick, Mitchell & Co. v. Los Angeles Rams Football Co.,* 284 Md. 86, 91, 394 A.2d 801 (1978)). *See also Cant v. Bartlett, supra,* 292 Md. at 614, 440 A.2d 388. A final judgment "must be so far final as to determine and conclude the rights involved in the action, or to deny to the party seeking redress by the appeal the means of further prosecuting or defending his rights and interests in the subject matter of the proceeding." *DSS v. Stein,* 328 Md. 1, 10, 612 A.2d 880 (1992). *See also Peat, Marwick, Mitchell & Co., supra,* 284 Md. at 91, 394 A.2d 801.

Certain interlocutory orders are appealable under CJ section 12–303. Among those is an order entered in a civil case "[g]ranting a petition to stay arbitration pursuant to [CJ § 3–208]." CJ § 12–303(3)(ix). An order denying a petition to compel arbitration is not included in the enumerated appealable interlocutory orders in that statute.

Maryland Rule 2–602(a)(1) provides that, except as stated in subsection (b) of that rule, an order adjudicating fewer than all the claims in an action or less than an entire claim, or the rights and liabilities of fewer than all the parties, is not a final judgment. The exception to that rule, in subsection (b), provides, in relevant part:

If the court expressly determines in a written order that there is no just reason for delay, it may direct in the order the entry of a final judgment:

(1) as to one or more but fewer than all of the claims or parties[.]

The word "claim" in this rule means a complete, substantive cause of action. *Suitland Dev. Corp. v. Merchants Mtg. Co.,* 254 Md. 43, 54, 254 A.2d 359 (1969).

■ The purpose of the discretionary certification procedure in Rule 2–602(b), which is to be used sparingly, is to avoid piecemeal appeals and duplication of efforts and costs in cases involving multiple parties or claims. *Maryland–National Capital Park & Planning Comm'n v. Smith,* 333 Md. 3, 7, 633 A.2d 855 (1993); *Diener Enters. v. Miller,* 266 Md. 551, 555, 295 A.2d 470 (1972); *Allstate Ins. Co. v. Angeletti,* 71 Md.App. 210, 217, 524 A.2d 798 (1987).

Under Rule 8–602(e)(1), if an appellate court determines that the order being appealed is not a final judgment, and was not certified as one under Rule 2–602(b), but that the circuit court had discretion to enter a final judgment under Rule 2–602(b), the appellate court may, *inter alia,* enter a final judgment on its own initiative. If the appellate court does so, "it shall treat the notice of appeal as if filed on the date of the entry of the judgment and proceed with the appeal." Rule 8–602(e)(3).

Against that legal backdrop, we address *Town of Chesapeake Beach v. Pessoa Construction Company, Inc.,* 330 Md. 744, 625 A.2d 1014 (1993), which is pertinent to the issue before us.

In *Town of Chesapeake Beach v. Pessoa Construction Company, Inc., supra,* the parties entered into a construction contract that contained a mandatory and binding arbitration clause. About two years later, but before construction was completed, the Town declared Pessoa in default, and terminated it from the job. Two years after that, Pessoa filed suit against the Town for breach of contract, misrepresentation, and conspiracy. It also filed a motion to stay the action

pending arbitration. The Town objected to the motion, pointing out that Pessoa had not filed a demand for arbitration and had lost its right to arbitrate.

The court granted the motion to stay. About six months later, Pessoa filed its demand for arbitration with the American Arbitration Association. The Town then filed a petition to stay arbitration, under CJ section 3–208, in the pending circuit court action, contending that Pessoa's demand for arbitration was untimely and that its delay in filing the demand acted as a relinquishment of the right to arbitrate. Pessoa filed an objection to the petition.

The circuit court determined that on the undisputed facts, Pessoa's demand was not untimely, and therefore it had not relinquished its right to arbitrate. Accordingly, the court entered an order denying the Town's petition to stay arbitration. The Town appealed, and this Court, in an unreported opinion, dismissed the appeal, as not being taken from a final judgment.

The Court of Appeals granted *certiorari* and reversed, holding that the order was an appealable final judgment. The Court explained that a petition to stay arbitration under CJ section 3–208 is a discrete claim: it may be prosecuted in a separate action and "[t]he relief sought by the moving party in such an action does not bear on the merits of the underlying claim; it relates solely to the forum to be used for the resolution of that dispute." 330 Md. at 751, 625 A.2d 1014. In such a separately prosecuted action, the court's order granting or denying the petition to stay arbitration decides the entire issue before the court, and leaves nothing more for the court to do. Thus, it is a final judgment under CJ section 12–301.

The Court reasoned that the Town's petition to stay arbitration under CJ section 3–208, while filed in the pending civil action between the parties, nevertheless constituted a separate claim; and the circuit court's order denying the petition to stay arbitration "completely terminated the claim." 330 Md. at 754, 625 A.2d 1014. The Court then exercised its discretion

to enter a final judgment on that claim, pursuant to Rule 8–602(e)(1).[3]

 The analysis of the Court in *Town of Chesapeake Beach* applies with equal force to this case. Like an action to stay arbitration, under CJ section 3–208, an action to compel arbitration under CJ section 3–207 may be prosecuted separately. That statute provides:

(a) *Refusal to arbitrate.*—If a party to an arbitration agreement described in § 3–202 refuses to arbitrate, the other party may file a petition with a court to order arbitration.

(b) *Denial of existence of arbitration agreement.*—If the opposing party denies existence of an arbitration agreement, the court shall proceed expeditiously to determine if the agreement exists.

(c) *Determination by court.*—If the court determines that the agreement exists, it shall order arbitration. Otherwise it shall deny the petition.

Thus, by statute, a petition to compel arbitration may properly be filed as a free-standing action against the party refusing to submit the dispute to arbitration. *Bel Pre Med. Ctr. v. Frederick Contractors, Inc.*, 21 Md.App. 307, 319–20, 320 A.2d 558 (1974), *modified on other grounds*, 274 Md. 307, 334 A.2d 526 (1975) (noting that at common law suits to compel arbitration could not be brought). In that situation, a court's order deciding such an action disposes of the action in its entirety, regardless of whether the order grants or denies the petition. Once the court orders arbitration, or denies it, there is nothing left for it to do. Accordingly, the court's order is a final judgment under CJ section 12–301.

---

**3.** The Court went on to hold that the order denying the Town's petition to stay arbitration also was appealable under the collateral order doctrine, recognized by the Supreme Court in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). That doctrine "treats as final and appealable a limited class of orders which do not terminate litigation in the trial court." *DSS v. Stein*, *supra*, 328 Md. at 10, 612 A.2d 880 (quoting *Public Service Comm'n v. Patuxent Valley*, 300 Md. 200, 206, 477 A.2d 759 (1984)).

In the case at bar, OPF could have filed a separate action in the circuit court, petitioning the court to order Innovative to submit the parties' dispute to arbitration. Instead, it filed its petition to compel arbitration in the pending action between the parties. For the same reasons offered by the Court in *Town of Chesapeake Beach, supra,* OPF's petition was a separate claim, concerning the proper forum for resolution of the parties' dispute. *See also Holmes v. Coverall North America, Inc.,* 336 Md. 534, 535, 649 A.2d 365 (1994) (noting that an arbitration clause in a contract "is a severable contract which is enforceable independently from the contract as a whole"); *Joseph Trionfo & Sons, Inc. v. Ernest B. LaRosa, Inc.,* 38 Md.App. 598, 609, 381 A.2d 727 (1978) (noting, in *dicta,* before the joinder of law and equity, that the proper procedure for petitioning a court to compel arbitration under CJ section 3–207 was to file a separate suit in equity, and that the order deciding the issue would be appealable under CJ section 12–301). Accordingly, the circuit court's order denying the petition resolved that claim in its entirety.

None of the parties to this case asked the circuit court to certify its order denying OPF's claim for arbitration as a final judgment under Rule 2–602(b). As we have explained, and as the Court's decision in *Town of Chesapeake Beach* exemplifies, under Rule 8–602(e)(1), if an appellate court concludes that the order being appealed is one the circuit court properly could have exercised its discretion to certify as final, under Rule 2–602(b), we may exercise our discretion to certify the order as final.

 "Arbitration is a 'process whereby parties voluntarily agree to substitute a private tribunal for the public tribunal otherwise available to them.'" *Curtis G. Testerman Co. v. Buck,* 340 Md. 569, 579, 667 A.2d 649 (1995) (quoting *Gold Coast Mall, Inc. v. Larmar Corp.,* 298 Md. 96, 103, 468 A.2d 91 (1983)). In Maryland, suits to compel arbitration are viewed as "favored" actions. *Bel Pre Medical Ctr., Inc. v. Frederick Contractors, supra,* 21 Md.App. at 320, 320 A.2d 558. Arbitration clauses will be freely enforced when there is

an agreement to arbitrate the subject matter of the dispute. *Gold Coast Mall, Inc. v. Larmar Corp., supra,* 298 Md. at 104, 468 A.2d 91.

 The strong legislative policy in favor of enforcing arbitration agreements underlies CJ section 3–207, which, as we have explained, permits an independent action to enforce an arbitration clause. For purposes of appeal, that policy also favors treating as final an order denying a petition to compel arbitration filed under CJ section 3–207 in an already pending case. The question whether parties agreed to arbitrate their dispute, whether raised in an independent action either to stay or compel arbitration or in a petition to stay or compel arbitration filed by one of the parties in an existing suit involving the same dispute, concerns the proper forum in which the dispute is to be resolved. A final resolution of that predicate issue will prevent future piecemeal appeals, repeated litigation of the disputed issue in a public and private forum, and needless expense to the parties. In the case of a petition to compel arbitration filed in an already pending action, that finality only can be obtained by permitting an appeal from an order denying such a petition.

For those reasons, we conclude that in this case the circuit court properly could have exercised its discretion to certify as final its order denying OPF's motion to stay and petition to compel arbitration, and we exercise our discretion to do the same.

### (ii)

We now turn to the merits of the appeal.

 Whether there is an agreement to arbitrate the parties' dispute is a legal question of contract interpretation. *Society of Am. Foresters v. Renewable Natural Resources Found.,* 114 Md.App. 224, 234, 689 A.2d 662 (1997); *Joseph F. Trionfo & Sons, Inc. v. Ernest B. LaRosa & Sons, Inc., supra,* 38 Md.App. at 604–07, 381 A.2d 727. *See also International Bhd. of Elec. Workers, Local 26 v. AdVin Elec., Inc.,* 98 F.3d 161, 164 (4th Cir.1996)(applying Maryland law). The princi-

ples of contract interpretation were explained as follows by Judge Salmon, in *Society of Am. Foresters v. Renewable Natural Resources Found., supra:*

> "A fundamental principle of contract interpretation is to ascertain and effectuate the intention of the parties." The language of the contract itself is the primary source for determining the parties' intentions. If the language of a contract is clear, "it must be presumed that the parties meant what they expressed." The "clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or intended it to mean." Rather, "the true test of what is meant is ... what a reasonable person in the position of the parties would have thought" the contract meant.

114 Md.App. at 234–35, 689 A.2d 662 (citations omitted).

In determining the scope of an arbitration clause, the court must find "reliable evidence from the language actually employed in the contract that the parties intended the disputed issue to be the subject of arbitration, the intent of the parties being the controlling factor." *Joseph F. Trionfo & Sons v. Ernest B. LaRosa & Sons, Inc., supra,* 38 Md.App. at 605–06, 381 A.2d 727.

When the language of an arbitration clause is plain and the issue in dispute clearly falls within its scope, the court must compel arbitration. *Gold Coast Mall, Inc. v. Larmar Corp., supra,* 298 Md. at 104, 468 A.2d 91; *Bel Pre Med. Ctr. v. Frederick Contractors, Inc., supra,* 21 Md.App. at 321, 320 A.2d 558. Conversely, if there is an arbitration agreement but the issue in dispute plainly falls outside its scope, the court must deny a motion to compel arbitration. *Gold Coast Mall, Inc. v. Larmar Corp., supra,* 298 Md. at 104, 468 A.2d 91; *Contract Constr., Inc. v. Power Tech. Ctr. Ltd. Prtnrshp.,* 100 Md.App. 173, 178, 640 A.2d 251 (1994). When the parties have agreed to arbitrate, but the scope of the arbitration clause is ambiguous, so it is not evident whether their dispute is subject to arbitration, the arbitrator, not the court, must resolve the ambiguity:

[T]he legislative policy in favor of the enforcement of agreements to arbitrate dictates that the question should be left to the decision of the arbitrator. Whether the party seeking arbitration is right or wrong is a question of contract application and interpretation for the arbitrator, not the court, ... and the court should not deprive the party seeking arbitration of the arbitrator's skilled judgment by attempting to resolve the ambiguity.

*Bel Pre Med. Ctr. v. Frederick Contractors, Inc., supra,* 21 Md.App. at 321–22, 320 A.2d 558 (citations omitted). *See also Gold Coast Mall, Inc. v. Larmar Corp., supra,* 298 Md. at 107, 468 A.2d 91; *Contract Constr., Inc. v. Power Tech. Ctr. Ltd. Prtnrshp., supra,* 100 Md.App. at 178, 640 A.2d 251.

 In this case, the Association's By-laws provide, in Article VII, entitled "Professional Standards and Arbitration," at section 2, that it is the duty of Association members to abide by, *inter alia,* the Manual, "including the duty to arbitrate controversies arising out of real estate transactions as specified by Article 17 of the Code of Ethics [and Standards of Practice ('Code') ] and as further defined and in accordance with the procedures set forth in the *Code of Ethics and Arbitration Manual* of this association...."

Article 17 of the Code provides, in pertinent part:

In the event of contractual disputes or specific non-contractual disputes as defined in Standard of Practice 17–4 between REALTORS® associated with different firms, arising out of their relationship as REALTORS®, the REALTORS® shall submit the dispute to arbitration in accordance with the regulations of their Board or Boards rather than litigate the matter.

Four "Standards of Practice" follow Article 17. The first provides that "[t]he filing of litigation and refusal to withdraw from it by REALTORS® in an arbitrable matter constitutes a refusal to arbitrate." The second permits REALTORS® in a dispute otherwise subject to arbitration to avoid arbitration by so agreeing in writing. The third provides that when REALTORS® are acting solely as principals in real estate

transactions, they are not obligated to arbitrate disputes with other REALTORS®, absent an agreement to do so. The fourth standard covers the four specific "non-contractual disputes," referenced in Article 17, also covered by the arbitration requirement.

Appendix II to Part Ten of the Manual contains general definitions of the contracts that may arise between the parties to real estate transactions and their real estate brokers. It describes the contract between the listing broker and a cooperating broker as à unilateral contract emanating from an offer by the listing broker, often made by means of an MLS listing, and "formed only when accepted by the cooperating broker, and acceptance occurs only through the performance as the procuring cause of the successful transaction." A section of the Manual devoted to "Procuring Cause" opens by stating:

> Procuring cause disputes between sellers and listing brokers are often decided in court. The reasoning relied on by the courts in resolving such claims is articulated in Black's Law Dictionary, Fifth Edition, definition of procuring cause. . . . Disputes concerning the contracts between listing brokers and cooperating brokers, however, are addressed by the National Association's Arbitration Guidelines promulgated pursuant to Article 17 of the Code [ ]. While guidance can be taken from judicial determinations of disputes between sellers and listing brokers, procuring cause disputes between listing and cooperating brokers, or between two cooperating brokers, can be resolved based on similar though not identical principles.

The Manual goes on to explain the factors that arbitrators should take into account in deciding "procuring cause" disputes.

Returning to the case at bar, as we have noted, the parties are in accord that by virtue of their membership in the Association, they became parties to an agreement to submit certain of their disputes to binding arbitration. They disagree over whether their particular dispute falls within the scope of

the arbitration agreement. Specifically, they disagree over whether their dispute is a "contractual dispute," as that phrase is used in Article 17.[4]

OPF argues that while Innovative has couched its claims in causes of action in tort, its factual allegations reveal that the claims arise out of the parties' relationship as realtors at different firms and are essentially contractual. Specifically, the $32,000 that Innovative alleges OPF wrongfully retained as a benefit, improperly interfered with, and conspired to deprive it of, is the 4% sales commission on the Property that was authorized by the owner and offered by OPF in the MLS listing, and that Innovative claims it earned as the cooperating broker that was the procuring cause of the sale. OPF maintains that Innovative's entitlement *vel non* to the 4% cooperating broker's share of the commission is a contractual dispute because the entitlement only could have come about if the relationship between OPF and Innovative relative to this transaction gave rise to a contract.

Innovative responds that not every dispute over whether a cooperating broker was the procuring cause of a sale is a contractual dispute. Because its stated claims are causes of action in tort, not contract, the circuit court correctly ruled that the dispute before the court is not a contractual dispute.

The meaning of the phrase "contractual dispute" in Article 17, and whether the parties' dispute in this case is a "contractual dispute," are legal questions that we review under a non-deferential *de novo* standard, for legal correctness. If that phrase is unambiguous, and covers the dispute in this case, or if the phrase is ambiguous, the court erred in denying the motion to stay and petition to compel arbitration. On the other hand, if that phrase is unambiguous and does not cover the dispute in this case, the court was legally correct in its ruling. The threshold question, then, is whether the wording

---

4. The parties agree that their dispute does not fall within the scope of any of the four "non-contractual dispute" situations addressed in Standard of Practice 17-4.

of the arbitration agreement is ambiguous. Whether the language of a contract is ambiguous is a question of law, not fact, and is subject to *de novo* review by the appellate court. *Calomiris v. Woods,* 353 Md. 425, 434, 727 A.2d 358 (1999).

▮▮▮▮▮▮ Just because parties disagree about the meaning of the words in a written agreement does not mean that they are ambiguous. Rather, words in an agreement are ambiguous if they are susceptible of more than one meaning to a reasonable person. *Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441 (1999); *Calomiris v. Woods, supra,* 353 Md. at 436, 727 A.2d 358; *Davis v. Magee,* 140 Md.App. 635, 650, 782 A.2d 351 (2001). "The test of ambiguity is whether, considering the 'character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution,' the language used in the contract, when read by a reasonably prudent person, is susceptible of more than one meaning." *State Dept. of Economic and Community Development v. Attman/Glazer P.B. Co.,* 323 Md. 592, 605, 594 A.2d 138 (1991) (quoting *Pacific Indem. Co. v. Interstate Fire & Casualty Co.,* 302 Md. 383, 388, 488 A.2d 486 (1985)). "[T]he clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean." *Auction & Estate Representatives, Inc. v. Ashton, supra,* 354 Md. at 340, 731 A.2d 441.

The plain meaning of the phrase "contractual dispute" is a dispute about a contract. Disputes about contracts can take many forms: for example, they may concern the terms of a contract, the consideration supporting it, or whether a contract has been breached. Likewise, whether parties have entered into a contract at all is itself a contractual dispute. Indeed, it is axiomatic that a dispute between parties over whether a contract was formed is a contractual dispute.

In *Rosenthal v. Al Packer Ford, Inc.,* 36 Md.App. 349, 374 A.2d 377 (1977), we explained that one of the ways a contract can be formed is by acceptance of an offer by performance. A

contract so formed is often termed a "unilateral contract." We stated:

"The offer by one party of specified compensation for the performance of a certain act as a proposition to all persons who may accept and comply with its conditions constitutes a promise by the offeror. The performance of that act is the consideration for such promise. The result is an enforceable contract."

*Id.* at 353, 374 A.2d 377 (quoting *Las Vegas Hacienda, Inc. v. Gibson*, 77 Nev. 25, 359 P.2d 85, 86 (1961)). *See also Sharp Elecs. Corp. v. Deutsche Fin. Serv. Corp.*, 216 F.3d 388, 393 (4th Cir.2000)(applying Maryland law)(observing that "under a unilateral contract, as long as the promisor holds open his offer inviting acceptance by performance, the promisee can bind the promisor by such performance"); *King v. Industrial Bank of Washington*, 474 A.2d 151, 156 (D.C.1984) (holding that in a unilateral contract, the act the offer seeks is the consideration for the promise; performance of the act constitutes acceptance of the offer, and at that point, a contract comes into being). *See also* E. Allen Farnsworth, *Farnsworth on Contracts*, at 189 § 3.4, (2d ed. 1998) ("In forming a unilateral contract only one party makes a promise: the offeror makes the promise contained in the offer, and the offeree renders some performance as acceptance.").

In the case at bar, as we have noted, OPF made an offer in its MLS listing to all cooperating brokers (whether subagents or buyer's agents) that it would pay 4% of the sales commission to the cooperating broker who procured the buyer. The Listing Contract authorized OPF to make such an offer. OPF's offer invited acceptance by performance: In other words, becoming a cooperating broker would be acceptance of OPF's offer through performance. The end result would be an enforceable contract between OPF and that broker for the 4% sales commission on the Property.

In its amended complaint, Innovative alleges that it was the procuring cause of the sale of the Property and therefore was entitled to the 4% sales commission. That allegation is the

foundation for its tort claims. The only basis on which Innovative would be entitled to the 4% sales commission, however, is if by performance it had accepted OPF's offer to pay the 4% commission, i.e., if a unilateral contract was formed between OPF and Innovative. Thus, the dispute between Innovative and OPF is at its heart a dispute over whether a contract·was formed between the two. As stated above, a dispute between parties over whether they entered into a contract is a contractual dispute.

The plain meaning of the phrase "contractual dispute" in the arbitration agreement set forth in Article 17 of the Code encompasses the dispute in this case, which is in essence whether Innovative was entitled to the 4% sales commission offered by OPF. The provisions in the Manual lend further support for that interpretation. Notwithstanding that the claims stated by Innovative sound in tort, the dispute between the parties is contractual—and the tort claims cannot be litigated unless the parties' contractual dispute is resolved.

Unjust enrichment is a form of restitution. It provides that "[a] person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment." *Berry & Gould v. Berry,* 360 Md. 142, 151, 757 A.2d 108(2000) (quoting Restatement (Second) of Restitution § 1 (Tentative Draft No. 1, 1983)(Tent. Restatement at 8–9)). Ordinarily, however, when there is a contract between the parties, one party may not recover against the other for unjust enrichment. *County Commissioners v. Dashiell,* 358 Md. 83, 96, 747 A.2d 600 (2000) (quoting *Mass Transit Admin. v. Granite Constr. Co.,* 57 Md.App. 766, 776, 471 A.2d 1121 (1984) (citations omitted)). *See also FLF, Inc. v. World Publications, Inc.,* 999 F.Supp. 640, 642 (D.Md.1998)(commenting that "[i]t is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract"). Thus, if a contract came into being between OPF and Innovative, the terms of the

contract would control the relationship of the parties, and would prevent any recovery by Innovative for unjust enrichment.

Likewise, Innovative's intentional interference with business relations claim against OPF and the Bealls depends on the resolution of Innovative's contractual dispute with OPF. To prevail on a tortious interference with business relations claim, the plaintiff must prove that the defendant engaged in intentional and wilful acts calculated to cause him damage in his lawful business, with the unlawful purpose to cause such damage, without right or justification, and with actual damage resulting. *Natural Design, Inc. v. The Rouse Co.*, 302 Md. 47, 71, 485 A.2d 663 (1984). Here, Innovative has alleged that OPF and the Bealls interfered with its lawful business by depriving it of the 4% sales commission to which it was entitled because its broker was the procuring cause of the sale. As we have explained, whether Innovative has a right to collect the 4% commission depends on whether a unilateral contract came into being between it and OPF. We do not mean to suggest that if such a contract came into existence, there would be merit in Innovative's interference with business relations claim against either of the appellees (OPF or the Bealls). Nevertheless, as the claim has been asserted by Innovative, it cannot be decided without first determining whether a contract existed between Innovative and OPF.

The same is true for Innovative's civil conspiracy claim against OPF and the Bealls because " '[c]onspiracy' is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.*, 336 Md. 635, 645 n. 8, 650 A.2d 260 (1994). Rather, "[t]he underlying tort is the cause of action that should be set forth in a separate count. The alleged aiders, abettors, and co-conspirators are simply additional parties jointly liable with the principal perpetrator." *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 360, 758 A.2d 95 (2000).

The parties' arbitration agreement covered their contractual dispute over whether Innovative was the procuring cause of the sale and thus was entitled to the 4% sales commission on the Property. Accordingly, that issue was subject to binding arbitration, and the court erred in denying OPF's petition to compel arbitration. The court should have stayed the case pending arbitration of the contractual dispute, both because the Bealls are not parties to the arbitration agreement and because the arbitration does not dispose of the tort claims. As counsel for the parties acknowledged during oral argument, however, that may be the ultimate practical effect of the arbitration, because how the arbitration is resolved will have an impact on whether Innovative will have evidence sufficient to make out *prima facie* cases in its tort claims.

**ORDER VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY WITH INSTRUCTIONS TO ENTER ORDER GRANTING THE APPELLANT'S MOTION TO STAY AND PETITION TO COMPEL ARBITRATION IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.**